# IN RE PRIMUS

No. 77–56.   Argued January 16, 1978—Decided May 30, 1978

Powell, J., delivered the opinion of the Court, in which Burger, C. J., and Stewart, White, Blackmun, and Stevens, JJ., joined, and in all but the first paragraph of Part VI of which Marshall, J., joined. Blackmun, J., filed a concurring opinion, *post*, p. 439. Marshall, J., filed an opinion concurring in part and concurring in the judgment, *post*, p. 468. Rehnquist, J., filed a dissenting opinion, *post*, p. 440. Brennan, J., took no part in the consideration or decision of the case.

*Ray P. McClain* argued the cause for appellant. With him on the briefs were *Joel M. Gora, Laughlin McDonald, Neil Bradley,* and *H. Christopher Coates.*

*Richard B. Kale, Jr.,* Assistant Attorney General of South

Carolina, argued the cause for appellee. With him on the brief was *Daniel R. McLeod,* Attorney General.*

MR. JUSTICE POWELL delivered the opinion of the Court.

We consider on this appeal whether a State may punish a member of its Bar who, seeking to further political and ideological goals through associational activity, including litigation, advises a lay person of her legal rights and discloses in a subsequent letter that free legal assistance is available from a nonprofit organization with which the lawyer and her associates are affiliated. Appellant, a member of the Bar of South Carolina, received a public reprimand for writing such a letter. The appeal is opposed by the State Attorney General, on behalf of the Board of Commissioners on Grievances and Discipline of the Supreme Court of South Carolina. As this appeal presents a substantial question under the First and Fourteenth Amendments, as interpreted in *NAACP* v. *Button,* 371 U. S. 415 (1963), we noted probable jurisdiction.

I

Appellant, Edna Smith Primus, is a lawyer practicing in Columbia, S. C. During the period in question, she was associated with the "Carolina Community Law Firm,".[1] and was an officer of and cooperating lawyer with the Columbia branch of the American Civil Liberties Union (ACLU).[2] She re-

---

*Briefs of *amici curiae* were filed by *Herbert M. Rosenthal* and *Stuart A. Forsyth* for the State Bar of California, and by *Girardeau A. Spann* and *Alan B. Morrison* for Public Citizen et al.

[1] The court below determined that the Carolina Community Law Firm was " 'an expense sharing arrangement with each attorney keeping his own fees.' " 268 S. C. 259, 261, 233 S. E. 2d 301, 302 (1977). The firm later changed its name to Buhl, Smith & Bagby.

[2] The ACLU was organized in 1920 by individuals who had worked in the defense of the rights of conscientious objectors during World War I and political dissidents during the postwar period. It views itself as a "national non-partisan organization defending our Bill of Rights for all

ceived no compensation for her work on behalf of the ACLU,[3] but was paid a retainer as a legal consultant for the South Carolina Council on Human Relations (Council), a nonprofit organization with offices in Columbia.

During the summer of 1973, local and national newspapers reported that pregnant mothers on public assistance in Aiken County, S. C., were being sterilized or threatened with sterilization as a condition of the continued receipt of medical assistance under the Medicaid program.[4] Concerned by this development, Gary Allen, an Aiken businessman and officer of a local organization serving indigents, called the Council requesting that one of its representatives come to Aiken to address some of the women who had been sterilized. At the Council's behest, appellant, who had not known Allen previously, called him and arranged a meeting in his office in July 1973. Among those attending was Mary Etta Williams, who had been sterilized by Dr. Clovis H. Pierce after the birth of her third child. Williams and her grandmother attended the meeting because Allen, an old family friend, had invited

---

without distinction or compromise." ACLU, Presenting the American Civil Liberties Union 2 (1948). The organization's activities range from litigation and lobbying to educational campaigns in support of its avowed goals. See Rabin, Lawyers for Social Change: Perspectives on Public Interest Law, 28 Stan. L. Rev. 207, 211–212 (1976); Note, Private Attorneys-General: Group Action in the Fight for Civil Liberties, 58 Yale L. J. 574, 576 (1949); see also App. 185–186. See generally C. Markmann, The Noblest Cry: A History of the American Civil Liberties Union (1965); D. Johnson, The Challenge to American Freedoms: World War I and the Rise of the American Civil Liberties Union (1963).

[3] Although all three lawyers in the Carolina Community Law Firm maintained some association with the ACLU—appellant and Carlton Bagby as unsalaried cooperating lawyers, and Herbert Buhl as staff counsel—appellant testified that "the firm did not handle any litigation for [the] ACLU." App. 134.

[4] See, e. g., 3 Carolina Doctors Are Under Inquiry in Sterilization of Welfare Mothers, New York Times, July 22, 1973, p. 30, cols. 1–3.

them and because Williams wanted "[t]o see what it was all about . . . ." App. 41–42. At the meeting, appellant advised those present, including Williams and the other women who had been sterilized by Dr. Pierce, of their legal rights and suggested the possibility of a lawsuit.

Early in August 1973 the ACLU informed appellant that it was willing to provide representation for Aiken mothers who had been sterilized.[5] Appellant testified that after being advised by Allen that Williams wished to institute suit against Dr. Pierce, she decided to inform Williams of the ACLU's offer of free legal representation. Shortly after receiving appellant's letter, dated August 30, 1973 [6]—the centerpiece of this

---

[5] App. 94–95, 131–133, 135–137; Brief for Appellee 8.

[6] Written on the stationery of the Carolina Community Law Firm, the letter stated:

August 30, 1973

Mrs. Marietta Williams
347 Sumter Street
Aiken, South Carolina 29801

Dear Mrs. Williams:

You will probably remember me from talking with you at Mr. Allen's office in July about the sterilization performed on you. The American Civil Liberties Union would like to file a lawsuit on your behalf for money against the doctor who performed the operation. We will be coming to Aiken in the near future and would like to explain what is involved so you can understand what is going on.

Now I have a question to ask of you. Would you object to talking to a women's magazine about the situation in Aiken? The magazine is doing a feature story on the whole sterilization problem and wants to talk to you and others in South Carolina. If you don't mind doing this, call me *collect* at 254–8151 on Friday before 5:00, if you receive this letter in time. Or call me on Tuesday morning (after Labor Day) *collect*.

I want to assure you that this interview is being done to show what is happening to women against their wishes, and is not being done to harm you in any way. But I want you to decide, so call me collect and let me know of your decision. This practice must stop.

About the lawsuit, if you are interested, let me know, and I'll let you know when we will come down to talk to you about it. We will be coming

litigation—Williams visited Dr. Pierce to discuss the progress of her third child who was ill. At the doctor's office, she encountered his lawyer and at the latter's request signed a release of liability in the doctor's favor. Williams showed appellant's letter to the doctor and his lawyer, and they retained a copy. She then called appellant from the doctor's office and announced her intention not to sue. There was no further communication between appellant and Williams.

On October 9, 1974, the Secretary of the Board of Commissioners on Grievances and Discipline of the Supreme Court of South Carolina (Board) filed a formal complaint with the Board, charging that appellant had engaged in "solicitation in violation of the Canons of Ethics" by sending the August 30, 1973, letter to Williams. App. 1–2. Appellant denied any unethical solicitation and asserted, *inter alia,* that her conduct was protected by the First and Fourteenth Amendments and by Canon 2 of the Code of Professional Responsibility of the American Bar Association (ABA). The complaint was heard by a panel of the Board on March 20, 1975. The State's evidence consisted of the letter, the testimony of Williams,[7]

---

to talk to Mrs. Waters at the same time; she has already asked the American Civil Liberties Union to file a suit on her behalf.

Sincerely,
s/ Edna Smith
Edna Smith
Attorney-at-law

App. 3–4.

[7] Williams testified that at the July meeting appellant advised her of her legal remedies, of the possibility of a lawsuit if her sterilization had been coerced, and of appellant's willingness to serve as her lawyer without compensation. Williams recounted that she had told appellant that because her child was in critical condition, she "did not have time for" a lawsuit and "would contact [appellant] some more." She also denied that she had expressed to Allen an interest in suing her doctor. *Id.,* at 29–34, 58. On cross-examination, however, Williams confirmed an earlier statement she had made in an affidavit that appellant "did not attempt to persuade or pressure me to file [the] lawsuit." *Id.,* at 52. See n. 28, *infra.*

and a copy of the summons and complaint in the action instituted against Dr. Pierce and various state officials, *Walker* v. *Pierce*, Civ. No. 74–475 (SC, July 28, 1975), aff'd in part and rev'd in part, 560 F. 2d 609 (CA4 1977), cert. denied, 434 U. S. 1075 (1978).[8]  Following denial of appellant's motion to dismiss, App. 77–82, she testified in her own behalf and called Allen, a number of ACLU representatives, and several character witnesses.[9]

The panel filed a report recommending that appellant be found guilty of soliciting a client on behalf of the ACLU, in violation of Disciplinary Rules (DR) 2–103 (D)(5)(a) and (c) [10] and 2–104 (A)(5) [11] of the Supreme Court of South

---

[8] This class action was filed on April 15, 1974, by two Negro women alleging that Dr. Pierce, in conspiracy with state officials, had sterilized them, or was threatening to do so, solely on account of their race and number of children, while they received assistance under the Medicaid program.  The complaint sought declaratory and injunctive relief, damages, and attorney's fees, and asserted violations of the Constitution and 42 U. S. C. §§ 1981, 1983, 1985 (3), and 2000d.

Bagby, one of appellant's associates in the Carolina Community Law Firm and fellow cooperating lawyer with the ACLU, was one of several attorneys of record for the plaintiffs.  Buhl, another of appellant's associates and a staff counsel for the ACLU in South Carolina, also may have represented one of the women.

[9] Appellant also offered to produce expert testimony to the effect that some measure of solicitation of prospective litigants is necessary in safeguarding the civil liberties of inarticulate, economically disadvantaged individuals who may not be aware of their legal rights and of the availability of legal counsel, App. 166–168; that the purpose of the ACLU is to advance and defend the cause of civil liberties, *id.*, at 183–186; and that the ACLU relies on decisions such as *NAACP* v. *Button*, 371 U. S. 415 (1963), in advising its attorneys of the extent of constitutional protection for their litigation activities, App. 187–188.  These offers of proof were rejected as not germane to the disciplinary proceeding.

[10] South Carolina's DR 2–103 (D) provides:

"(D) A lawyer shall not knowingly assist a person or organization that recommends, furnishes, or pays for legal services to promote the use of

Carolina,[12] and that a private reprimand be issued. It noted that "[t]he evidence is inconclusive as to whether [appellant] solicited Mrs. Williams on her own behalf, but she did solicit

his services or those of his partners or associates. However, he may cooperate in a dignified manner with the legal service activities of any of the following, provided that his independent professional judgment is exercised in behalf of his client without interference or control by any organization or other person:

"(1) A legal aid office or public defender office:

"(a) Operated or sponsored by a duly accredited law school.

"(b) Operated or sponsored by a bona fide non-profit community organization.

"(c) Operated or sponsored by a governmental agency.

"(d) Operated, sponsored, or approved by a bar association respresentative of the general bar of the geographical area in which the association exists.

"(2) A military legal assistance office.

"(3) A lawyer referral service operated, sponsored, or approved by a bar association representative of the general bar of the geographical area in which the association exists.

"(4) A bar association representative of the general bar of the geographical area in which the association exists.

"(5) Any other non-profit organization that recommends, furnishes, or pays for legal services to its members or beneficiaries, but only in those instances and to the extent that controlling constitutional interpretation at the time of the rendition of the services requires the allowance of such legal service activities, and only if the following conditions, unless prohibited by such interpretation, are met:

"(a) The primary purposes of such organization do not include the rendition of legal services.

"(b) The recommending, furnishing, or paying for legal services to its members is incidental and reasonably related to the primary purposes of such organization.

"(c) Such organization does not derive a financial benefit from the rendition of legal services by the lawyer.

"(d) The member or beneficiary for whom the legal services are rendered, and not such organization, is recognized as the client of the lawyer in that matter."

Mrs. Williams on behalf of the ACLU, which would benefit financially in the event of successful prosecution of the suit for money damages." The panel determined that appellant violated DR 2–103 (D)(5) "by attempting to solicit a client for a non-profit organization which, as its primary purpose, renders legal services, where respondent's associate is a

---

[11] South Carolina's DR 2–104 (A) provides:

"(A) A lawyer who has given unsolicited advice to a layman that he should obtain counsel or take legal action shall not accept employment resulting from that advice, except that:

"(1) A lawyer may accept employment by a close friend, relative, former client (if the advice is germane to the former employment), or one whom the lawyer reasonably believes to be a client.

"(2) A lawyer may accept employment that results from his participation in activities designed to educate laymen to recognize legal problems, to make intelligent selection of counsel, or to utilize available legal services if such activities are conducted or sponsored by any of the offices or organizations enumerated in DR 2–103 (D) (1) through (5), to the extent and under the conditions prescribed therein.

"(3) A lawyer who is furnished or paid by any of the offices or organizations enumerated in DR 2–103 (D) (1), (2), or (5) may represent a member or beneficiary thereof to the extent and under the conditions prescribed therein.

"(4) Without affecting his right to accept employment, a lawyer may speak publicly or write for publication on legal topics so long as he does not emphasize his own professional experience or reputation and does not undertake to give individual advice.

"(5) If success in asserting rights or defenses of his client in litigation in the nature of a class action is dependent upon the joinder of others, a lawyer may accept, but shall not seek, employment from those contacted for the purpose of obtaining their joinder."

[12] Section 4 (b) of the Supreme Court of South Carolina's Rule on Disciplinary Procedure defines misconduct as a "violation of any of the Canons of Professional Ethics as adopted by this Court from time to time . . . ." 22 S. C. Code, p. 59 (1977). On March 1, 1973, the state court adopted the ABA's Code of Professional Responsibility. Rule 32 of the Supreme Court of South Carolina, id., at 48. Although DR 2–103 (D) has been revised substantially by the ABA, South Carolina has not adopted that revision.

staff counsel for the non-profit organization." Appellant also was found to have violated DR 2–104 (A)(5) because she solicited Williams, after providing unsolicited legal advice, to join in a prospective class action for damages and other relief that was to be brought by the ACLU.

After a hearing on January 9, 1976, the full Board approved the panel report and administered a private reprimand. On March 17, 1977, the Supreme Court of South Carolina entered an order which adopted verbatim the findings and conclusions of the panel report and increased the sanction, *sua sponte,* to a public reprimand. 268 S. C. 259, 233 S. E. 2d 301.

On July 9, 1977, appellant filed a jurisdictional statement and this appeal was docketed. We noted probable jurisdiction on October 3, 1977, *sub nom. In re Smith,* 434 U. S. 814. We now reverse.

## II

This appeal concerns the tension between contending values of considerable moment to the legal profession and to society. Relying upon *NAACP* v. *Button,* 371 U. S. 415 (1963), and its progeny, appellant maintains that her activity involved constitutionally protected expression and association. In her view, South Carolina has not shown that the discipline meted out to her advances a subordinating state interest in a manner that avoids unnecessary abridgment of First Amendment freedoms.[13] Appellee counters that appellant's letter to Williams falls outside of the protection of *Button,* and that

---

[13] In addition to her claim of protection under this Court's *Button* decision, appellant contends that (i) the State's failure to give her fair notice of the precise charges leveled against her in the disciplinary proceeding worked a violation of due process, see *In re Ruffalo,* 390 U. S. 544 (1968); (ii) the absence of proof of essential elements of the Disciplinary Rules also violated due process, see *Thompson* v. *Louisville,* 362 U. S. 199 (1960); and (iii) the Disciplinary Rules are void for vagueness under the First and Fourteenth Amendments, see *Bouie* v. *Columbia,* 378 U. S. 347 (1964). In view of our disposition of this case, we do not reach these contentions.

South Carolina acted lawfully in punishing a member of its Bar for solicitation.

The States enjoy broad power to regulate "the practice of professions within their boundaries," and "[t]he interest of the States in regulating lawyers is especially great since lawyers are essential to the primary governmental function of administering justice, and have historically been 'officers of the courts.' " *Goldfarb* v. *Virginia State Bar,* 421 U. S. 773, 792 (1975). For example, we decide today in *Ohralik* v. *Ohio State Bar Assn., post,* p. 447, that the States may vindicate legitimate regulatory interests through proscription, in certain circumstances, of in-person solicitation by lawyers who seek to communicate purely commercial offers of legal assistance to lay persons.

Unlike the situation in *Ohralik,* however, appellant's act of solicitation took the form of a letter to a woman with whom appellant had discussed the possibility of seeking redress for an allegedly unconstitutional sterilization. This was not in-person solicitation for pecuniary gain. Appellant was communicating an offer of free assistance by attorneys associated with the ACLU, not an offer predicated on entitlement to a share of any monetary recovery. And her actions were undertaken to express personal political beliefs and to advance the civil-liberties objectives of the ACLU, rather than to derive financial gain. The question presented in this case is whether, in light of the values protected by the First and Fourteenth Amendments, these differences materially affect the scope of state regulation of the conduct of lawyers.

### III

In *NAACP* v. *Button, supra,* the Supreme Court of Appeals of Virginia had held that the activities of members and staff attorneys of the National Association for the Advancement of Colored People (NAACP) and its affiliate, the Virginia State Conference of NAACP Branches (Conference), constituted

"solicitation of legal business" in violation of state law. *NAACP* v. *Harrison*, 202 Va. 142, 116 S. E. 2d 55 (1960). Although the NAACP representatives and staff attorneys had "a right to peaceably assemble with the members of the branches and other groups to discuss with them and advise them relative to their legal rights in matters concerning racial segregation," the court found no constitutional protection for efforts to "solicit prospective litigants to authorize the filing of suits" by NAACP-compensated attorneys. *Id.*, at 159, 116 S. E. 2d, at 68–69.

This Court reversed: "We hold that the activities of the NAACP, its affiliates and legal staff shown on this record are modes of expression and association protected by the First and Fourteenth Amendments which Virginia may not prohibit, under its power to regulate the legal profession, as improper solicitation of legal business violative of [state law] and the Canons of Professional Ethics." 371 U. S., at 428–429. The solicitation of prospective litigants,[14] many of whom were not

---

[14] The *Button* Court described the solicitation activities of NAACP members and attorneys in the following terms:

"Typically, a local NAACP branch will invite a member of the legal staff to explain to a meeting of parents and children the legal steps necessary to achieve desegregation. The staff member will bring printed forms to the meeting authorizing him, and other NAACP or [NAACP Legal] Defense Fund attorneys of his designation, to represent the signers in legal proceedings to achieve desegregation. On occasion, blank forms have been signed by litigants, upon the understanding that a member or members of the legal staff, with or without assistance from other NAACP lawyers, or from the Defense Fund, would handle the case. It is usual after obtaining authorizations, for the staff lawyer to bring into the case the other staff members in the area where suit is to be brought, and sometimes to bring in lawyers from the national organization or the Defense Fund. In effect, then, the prospective litigant retains not so much a particular attorney as the firm of NAACP and Defense Fund lawyers . . . .

"These meetings are sometimes prompted by letters and bulletins from the Conference urging active steps to fight segregation. The Conference has on occasion distributed to the local branches petitions for desegregation

members of the NAACP or the Conference, for the purpose of furthering the civil-rights objectives of the organization and its members was held to come within the right " 'to engage in association for the advancement of beliefs and ideas.' " *Id.,* at 430, quoting *NAACP* v. *Alabama,* 357 U. S. 449, 460 (1958).

Since the Virginia statute sought to regulate expressive and associational conduct at the core of the First Amendment's protective ambit, the *Button* Court insisted that "government may regulate in the area only with narrow specificity." 371 U. S., at 433. The Attorney General of Virginia had argued that the law merely (i) proscribed control of the actual litigation by the NAACP after it was instituted, *ibid.,* and (ii) sought to prevent the evils traditionally associated with common-law maintenance, champerty, and barratry, *id.,* at 438.[15] The Court found inadequate the first justification because of an absence of evidence of NAACP interference with the actual conduct of litigation, or neglect or harassment of clients, and because the statute, as construed, was not drawn narrowly to advance the asserted goal. It rejected the analogy to the common-law offenses because of an absence of proof that malicious intent or the prospect of pecuniary gain inspired the NAACP-sponsored litigation. It also found a lack of proof that a serious danger of conflict of interest marked the relationship between the NAACP and its member and nonmember Negro litigants. The Court concluded that "although the [NAACP] has amply shown that its activities fall within the

---

to be signed by parents and filed with local school boards, and advised branch officials to obtain, as petitioners, persons willing to 'go all the way' in any possible litigation that may ensue." 371 U. S., at 421–422.

[15] Put simply, maintenance is helping another prosecute a suit; champerty is maintaining a suit in return for a financial interest in the outcome; and barratry is a continuing practice of maintenance or champerty. See generally 4 W. Blackstone, Commentaries *134–136; Zimroth, Group Legal Services and the Constitution, 76 Yale L. J. 966, 969–970 (1967); Radin, Maintenance by Champerty, 24 Calif. L. Rev. 48 (1935).

First Amendment's protections, the State has failed to advance any substantial regulatory interest, in the form of substantive evils flowing from [the NAACP's] activities, which can justify the broad prohibitions which it has imposed." *Id.*, at 444.[16]

---

[16] Whatever the precise limits of the holding in *Button,* the Court at least found constitutionally protected the activities of NAACP members and staff lawyers in "advising Negroes of their constitutional rights, urging them to institute litigation of a particular kind, recommending particular lawyers and financing such litigation." 371 U. S., at 447 (WHITE, J., concurring in part and dissenting in part). In the following Term, the Court noted that *Button* presented an "occasion to consider an . . . attempt by Virginia to enjoin the National Association for the Advancement of Colored People from advising prospective litigants to seek the assistance of particular attorneys. In fact, . . . the attorneys were actually employed by the association which recommended them, and recommendations were made even to nonmembers." *Railroad Trainmen* v. *Virginia Bar,* 377 U. S. 1, 7 (1964); see *Mine Workers* v. *Illinois Bar Assn.,* 389 U. S. 217, 221, 222–223 (1967).

The dissent of MR. JUSTICE REHNQUIST suggests that *Button* is distinguishable from this case because there "lawyers played only a limited role" in the solicitation of prospective litigants, and "the Commonwealth did not attempt to discipline the individual lawyers . . . ." *Post,* at 444, and n. 3. We do not think that *Button* can be read in this way. As the *Button* Court recognized, see n. 14, *supra,* and as the Virginia Supreme Court of Appeals had found, *NAACP* v. *Harrison,* 202 Va. 142, 154–155, 116 S. E. 2d 55, 65 (1960), NAACP staff attorneys were involved in the actual solicitation efforts. The absence of discipline in *Button* was not due to an absence of lawyer involvement in solicitation. Indeed, from all that appears, no one was disciplined; the case came to this Court in the posture of an anticipatory action for declaratory relief. The state court's decree made quite clear that "the solicitation of legal business by . . . [NAACP] attorneys, as shown by the evidence," and the acceptance of such solicited employment by NAACP-compensated attorneys, violated the state ban and the canons of ethics. *Id.,* at 164, 116 S. E. 2d, at 72. We therefore cannot view as dicta *Button*'s holding that "the activities of the NAACP . . . legal staff shown on this record are modes of expression and association protected by the First and Fourteenth Amendments which Virginia may not prohibit, under its power to regulate the legal profession, as improper solicitation of legal business . . . ." 371 U. S., at 428–429.

Subsequent decisions have interpreted *Button* as establishing the principle that "collective activity undertaken to obtain meaningful access to the courts is a fundamental right within the protection of the First Amendment." *United Transportation Union* v. *Michigan Bar,* 401 U. S. 576, 585 (1971). See *Bates* v. *State Bar of Arizona,* 433 U. S. 350, 376 n. 32 (1977). The Court has held that the First and Fourteenth Amendments prevent state proscription of a range of solicitation activities by labor unions seeking to provide low-cost, effective legal representation to their members. See *Railroad Trainmen* v. *Virginia Bar,* 377 U. S. 1 (1964); *Mine Workers* v. *Illinois Bar Assn.,* 389 U. S. 217 (1967); *United Transportation Union* v. *Michigan Bar, supra.* And "lawyers accepting employment under [such plans] have a like protection which the State cannot abridge." *Railroad Trainmen, supra,* at 8. Without denying the power of the State to take measures to correct the substantive evils of undue influence, overreaching, misrepresentation, invasion of privacy, conflict of interest, and lay interference that potentially are present in solicitation of prospective clients by lawyers, this Court has required that "broad rules framed to protect the public and to preserve respect for the administration of justice" must not work a significant impairment of "the value of associational freedoms." *Mine Workers, supra,* at 222.

## IV

We turn now to the question whether appellant's conduct implicates interests of free expression and association sufficient to justify the level of protection recognized in *Button* and subsequent cases.[17] The Supreme Court of South Carolina found appellant to have engaged in unethical conduct because

---

[17] Appellee "finds no fault in Appellant's conduct in meeting with the women to advise them of their legal rights, even if such advice was unsolicited. There is no doubt that such activity is protected under the First Amendment." Brief for Appellee 30.

she " 'solicit[ed] a client for a non-profit organization, which, as its primary purpose, renders legal services, where respondent's associate is a staff counsel for the non-profit organization.' " 268 S. C., at 269, 233 S. E. 2d, at 306.[18] It rejected appellant's First Amendment defenses by distinguishing *Button* from the case before it. Whereas the NAACP in that case was primarily a " 'political' " organization that used " 'litigation as an adjunct to the overriding political aims of the organization,' " the ACLU " 'has as one of its primary purposes the rendition of legal services.' " *Id.,* at 268, 269, 233 S. E. 2d, at 305, 306. The court also intimated that the ACLU's policy of requesting an award of counsel fees indicated that the organization might " 'benefit financially in the event of successful prosecution of the suit for money damages.' " *Id.,* at 263, 233 S. E. 2d, at 303.

Although the disciplinary panel did not permit full factual development of the aims and practices of the ACLU, see n. 9, *supra,* the record does not support the state court's effort to draw a meaningful distinction between the ACLU and the NAACP. From all that appears, the ACLU and its local chapters, much like the NAACP and its local affiliates in *Button,* "[engage] in extensive educational and lobbying activities" and "also [devote] much of [their] funds and energies to an extensive program of assisting certain kinds of litigation on behalf of [their] declared purposes." 371 U. S., at 419–420. See App. 177–178; n. 2, *supra.* The court below acknowledged that " 'the ACLU has only entered cases in which substantial civil liberties questions are involved . . . .' " 268 S. C., at 263, 233 S. E. 2d, at 303. See *Button,* 371 U. S., at 440 n. 19. It has engaged in the defense of unpopular

---

[18] In the discussion that follows, we do not treat separately the two Disciplinary Rules upon which appellant's violation was based. Since DR 2–103 (D)(5) was held by the court below to proscribe in a narrower fashion the same conduct as DR 2–104 (A)(5), see n. 26, *infra,* a determination of unconstitutionality as to the former would subsume the latter.

causes and unpopular defendants [19] and has represented individuals in litigation that has defined the scope of constitutional protection in areas such as political dissent, juvenile rights, prisoners' rights, military law, amnesty, and privacy. See generally Rabin, Lawyers for Social Change: Perspectives on Public Interest Law, 28 Stan. L. Rev. 207, 210–214 (1976). For the ACLU, as for the NAACP, "litigation is not a technique of resolving private differences"; it is "a form of political expression" and "political association." 371 U. S., at 429, 431.[20]

We find equally unpersuasive any suggestion that the level of constitutional scrutiny in this case should be lowered because of a possible benefit to the ACLU. The discipline administered to appellant was premised solely on the possibility of financial benefit to the organization, rather than any possibility of pecuniary gain to herself, her associates, or the lawyers representing the plaintiffs in the *Walker* v. *Pierce* litigation.[21] It is conceded that appellant received no com-

---

[19] See, *e. g.*, *Scopes* v. *State*, 154 Tenn. 105, 289 S. W. 363 (1927); *De Jonge* v. *Oregon*, 299 U. S. 353 (1937); *Hague* v. *CIO*, 307 U. S. 496 (1939); *Wieman* v. *Updegraff*, 344 U. S. 183 (1952); *United States* v. *O'Brien*, 391 U. S. 367 (1968); *Oestereich* v. *Selective Service Bd.*, 393 U. S. 233 (1968).

[20] There is nothing in the record to suggest that the ACLU or its South Carolina affiliate is an organization dedicated exclusively to the provision of legal services. See n. 2, *supra*. Nor does the record support any inference that either the ACLU or its affiliate "is a mere sham to cover what is actually nothing more than an attempt," *Eastern Railroad Presidents Conf.* v. *Noerr Motor Freight, Inc.*, 365 U. S. 127, 144 (1961), by a group of attorneys to evade a valid state rule against solicitation for pecuniary gain. Compare *Valentine* v. *Chrestensen*, 316 U. S. 52, 55 (1942), with *New York Times Co.* v. *Sullivan*, 376 U. S. 254, 266 (1964). Cf. *California Transport* v. *Trucking Unlimited*, 404 U. S. 508, 515 (1972).

[21] Appellee conjectures that appellant would have received increased support from private foundations if her reputation was enhanced as a result of her efforts in the cause of the ACLU. The decision below acknowledged, however, that the evidence did not support a finding that appellant solicited Williams on her own behalf. 268 S. C., at 263, 233 S. E. 2d, at 303. Since the discipline in this case was premised solely on the possibility that

pensation for any of the activities in question. It is also undisputed that neither the ACLU nor any lawyer associated with it would have shared in any monetary recovery by the plaintiffs in *Walker* v. *Pierce*. If Williams had elected to bring suit, and had been represented by staff lawyers for the ACLU, the situation would have been similar to that in *Button,* where the lawyers for the NAACP were "organized as a staff and paid by" that organization. 371 U. S., at 434; see *id.,* at 457 (Harlan, J., dissenting); *Mine Workers* v. *Illinois Bar Assn.,* 389 U. S., at 222–223; n. 16, *supra.*[22]

Contrary to appellee's suggestion, the ACLU's policy of requesting an award of counsel fees does not take this case outside of the protection of *Button.* Although the Court in *Button* did not consider whether the NAACP seeks counsel fees, such requests are often made both by that organization, see, *e. g., NAACP* v. *Allen,* 493 F. 2d 614, 622 (CA5 1974); *Boston Chapter, NAACP, Inc.* v. *Beecher,* 371 F. Supp. 507, 523 (Mass.), aff'd, 504 F. 2d 1017 (CA1 1974), cert. denied, 421 U. S. 910 (1975), and by the NAACP Legal Defense Fund, Inc., see, *e. g., Bradley* v. *Richmond School Board,* 416 U. S. 696 (1974); *Reynolds* v. *Coomey,* 567 F. 2d 1166, 1167 (CA1 1978). In any event, in a case of this kind there are differences between counsel fees awarded by a court and traditional fee-paying arrangements which militate against a presumption

---

appellant's solicitation might have conferred a financial benefit on the ACLU, *ibid.,* and any award of counsel fees would have been received only for the organization's benefit, see n. 24, *infra,* we also attach no significance to the fact that two of the attorneys in the *Doe* v. *Pierce* litigation were associated with appellant in an arrangement for sharing office expenses. See nn. 1, 8, *supra.*

[22] "The Virginia State Conference of [NAACP] Branches or petitioner pays the fees and expenses of the attorneys when they are handling a case involving discrimination, supported by the state or the national organization . . . . A fee of $60 per day is paid to the attorneys . . . who are almost invariably members of the legal staff." Brief for Petitioner in *NAACP* v. *Gray,* O. T. 1962, No. 5, pp. 9–10.

that ACLU sponsorship of litigation is motivated by considerations of pecuniary gain rather than by its widely recognized goal of vindicating civil liberties. Counsel fees are awarded in the discretion of the court; awards are not drawn from the plaintiff's recovery, and are usually premised on a successful outcome; and the amounts awarded often may not correspond to fees generally obtainable in private litigation. Moreover, under prevailing law during the events in question, an award of counsel fees in federal litigation was available only in limited circumstances.[23]   And even if there had been an award during the period in question, it would have gone to the central fund of the ACLU.[24]   Although such benefit to the organiza-

---

[23] In *Alyeska Pipeline Service Co.* v. *Wilderness Society,* 421 U. S. 240 (1975), the Court held that a federal court may not award counsel fees in the absence of specific statutory authorization, a showing of "bad faith" in the conduct of the litigation, or facts giving rise to a "common fund" or "common benefit" recovery. The Court of Appeals for the Fourth Circuit anticipated our ruling in *Alyeska.* See *Bradley* v. *School Board of Richmond,* 472 F. 2d 318, 327–331 (1972), vacated and remanded on other grounds, 416 U. S. 696 (1974); *Bradley* v. *School Board of Richmond,* 345 F. 2d 310, 321 (1965).

[24] Appellant informs us that the ACLU policy then in effect provided that cooperating lawyers associated with the ACLU or with an affiliate could not receive an award of counsel fees for services rendered in an ACLU-sponsored litigation. Reply Brief for Appellant 4–5; see App. 173–175, 181–183; 1976 Policy Guide of the American Civil Liberties Union, Policy #512, p. 302:

"Under no circumstances may any cooperating attorney associated in any way with an ACLU or affiliate case receive payment for services rendered in such a case, whether as a fee or voluntary donation.  The smallest exception to this rule would jeopardize the voluntary nature of the cooperating system and the effectiveness of ACLU's entire legal program."

Apparently it was feared that allowing acceptance of such fees might lead to selection of clients and cases for pecuniary reasons.  See App. 182.

This policy was changed in 1977 to permit local experimentation with the sharing of court-awarded fees between state affiliates and cooperating attorneys.  The South Carolina chapter has not exercised that option. Reply Brief for Appellant 5–6.  We express no opinion whether our analy-

tion may increase with the maintenance of successful litigation, the same situation obtains with voluntary contributions and foundation support, which also may rise with ACLU victories in important areas of the law. That possibility, standing alone, offers no basis for equating the work of lawyers associated with the ACLU or the NAACP with that of a group that exists for the primary purpose of financial gain through the recovery of counsel fees. See n. 20, *supra.*[25]

Appellant's letter of August 30, 1973, to Mrs. Williams thus comes within the generous zone of First Amendment protection reserved for associational freedoms. The ACLU engages in litigation as a vehicle for effective political expression and association, as well as a means of communicating useful information to the public. See n. 32, *infra;* cf. *Bates* v. *State Bar of Arizona,* 433 U. S., at 364; *Virginia Pharmacy Board* v. *Virginia Citizens Consumer Council,* 425 U. S. 748, 779–780 (1976) (STEWART, J., concurring). As *Button* indicates, and as appellant offered to prove at the disciplinary hearing, see n. 9, *supra,* the efficacy of litigation as a means of advancing the cause of civil liberties often depends on the ability to make legal assistance available to suitable litigants.

---

sis in this case would be different had the latter policy been in effect during the period in question.

[25] The Internal Revenue Service has announced certain requirements for "public interest law firms" that seek tax-exempt status under § 501 (c) (3) of the Internal Revenue Code of 1954, 26 U. S. C. § 501 (c) (3). Such an organization (i) may not accept fees from its clients as compensation for services rendered; (ii) may accept fees "in public interest cases" only if such fees are awarded by a court or administrative agency; (iii) may "not use the likelihood or probability of a fee award as a consideration in its selection of cases"; (iv) may not defray "more than 50 percent of the total cost of its legal functions" from awarded fees, unless an exemption is granted; (v) may not permit payment of awarded fees directly to individual staff attorneys; and (vi) may not accept awarded fees in circumstances that would result in any conflict with state law or professional canons of ethics. Rev. Proc. 75–13, § 3, 1975–1 Cum. Bull. 662. See Rev. Ruls. 75–74 through 75–76, 1975–1 Cum. Bull. 152–155.

" 'Free trade in ideas' means free trade in the opportunity to persuade to action, not merely to describe facts." *Thomas* v. *Collins,* 323 U. S. 516, 537 (1945). The First and Fourteenth Amendments require a measure of protection for "advocating lawful means of vindicating legal rights," *Button,* 371 U. S., at 437, including "advis[ing] another that his legal rights have been infringed and refer[ring] him to a particular attorney or group of attorneys . . . for assistance," *id.,* at 434.

## V

South Carolina's action in punishing appellant for soliciting a prospective litigant by mail, on behalf of the ACLU, must withstand the "exacting scrutiny applicable to limitations on core First Amendment rights . . . ." *Buckley* v. *Valeo,* 424 U. S. 1, 44–45 (1976). South Carolina must demonstrate "a subordinating interest which is compelling," *Bates* v. *Little Rock,* 361 U. S. 516, 524 (1960), and that the means employed in furtherance of that interest are "closely drawn to avoid unnecessary abridgment of associational freedoms." *Buckley, supra,* at 25.

Appellee contends that the disciplinary action taken in this case is part of a regulatory program aimed at the prevention of undue influence, overreaching, misrepresentation, invasion of privacy, conflict of interest, lay interference, and other evils that are thought to inhere generally in solicitation by lawyers of prospective clients, and to be present on the record before us. Brief for Appellee 37–49. We do not dispute the importance of these interests. This Court's decision in *Button* makes clear, however, that "[b]road prophylactic rules in the area of free expression are suspect," and that "[p]recision of regulation must be the touchstone in an area so closely touching our most precious freedoms." 371 U. S., at 438; see *Mine Workers* v. *Illinois Bar Assn.,* 389 U. S., at 222–223. Because of the danger of censorship through selective enforcement of broad prohibitions, and "[b]ecause First Amendment freedoms need breathing space to survive, gov-

ernment may regulate in [this] area only with narrow specificity." *Button, supra,* at 433.

## A

The Disciplinary Rules in question sweep broadly. Under DR 2-103 (D)(5), a lawyer employed by the ACLU or a similar organization may never give unsolicited advice to a lay person that he retain the organization's free services, and it would seem that one who merely assists or maintains a cooperative relationship with the organization also must suppress the giving of such advice if he or anyone associated with the organization will be involved in the ultimate litigation. See Tr. of Oral Arg. 32–34. Notwithstanding appellee's concession in this Court, it is far from clear that a lawyer may communicate the organization's offer of legal assistance at an informational gathering such as the July 1973 meeting in Aiken without breaching the literal terms of the Rule. Cf. Memorandum of Complainant, Apr. 8, 1975, p. 9.[26] Moreover, the Disciplinary Rules in question permit punishment for mere solicitation unaccompanied by proof of any of the substantive evils that appellee maintains were present in this case. In sum, the Rules in their present form have a distinct potential for dampening the kind of "cooperative activity that would make advocacy of litigation meaningful," *Button, supra,* at 438, as well as for permitting discretionary enforcement against unpopular causes.

## B

Even if we ignore the breadth of the Disciplinary Rules and the absence of findings in the decision below that support

---

[26] DR 2-104 (A)(5), as construed below, stands as a separate prohibition even though it appears in terms to be an exception to DR 2-104 (A), which bars only the acceptance of employment after the giving of unsolicited advice. It was applied in this case to an attorney who recommended participation in a prospective litigation and who did not accept any employment.

the justifications advanced by appellee in this Court,[27] we think it clear from the record—which appellee does not suggest is inadequately developed—that findings compatible with the First Amendment could not have been made in this case. As in *New York Times Co.* v. *Sullivan,* 376 U. S. 254, 284–285 (1964), "considerations of effective judicial administration require us to review the evidence in the present record to determine whether it could constitutionally support a judgment [against appellant]. This Court's duty is not limited to the elaboration of constitutional principles; we must also in proper cases review the evidence to make certain that those principles [can be] constitutionally applied." See *Jenkins* v. *Georgia,* 418 U. S. 153, 160–161 (1974); *Pickering* v. *Board of Education,* 391 U. S. 563, 574–575, 578–582, and n. 2 (1968); *Edwards* v. *South Carolina,* 372 U. S. 229, 235–236 (1963).

Where political expression or association is at issue, this Court has not tolerated the degree of imprecision that often characterizes government regulation of the conduct of commercial affairs. The approach we adopt today in *Ohralik, post,* p. 447, that the State may proscribe in-person solicitation for pecuniary gain under circumstances likely to result in adverse consequences, cannot be applied to appellant's activity on behalf of the ACLU. Although a showing of potential danger may suffice in the former context, appellant may not be disciplined unless her activity in fact involved the type of misconduct at which South Carolina's broad prohibition is said to be directed.

The record does not support appellee's contention that

---

[27] Rights of political expression and association may not be abridged because of state interests asserted by appellate counsel without substantial support in the record or findings of the state court. See *First National Bank of Boston* v. *Bellotti,* 435 U. S. 765, 789–790 (1978); *United Transportation Union* v. *Michigan Bar,* 401 U. S. 576, 581 (1971); *Sherbert* v. *Verner,* 374 U. S. 398, 407 (1963); *Button,* 371 U. S., at 442–443; *Wood* v. *Georgia,* 370 U. S. 375, 388 (1962); *Thomas* v. *Collins,* 323 U. S. 516, 530, 536 (1945).

undue influence, overreaching, misrepresentation, or invasion of privacy actually occurred in this case. Appellant's letter of August 30, 1973, followed up the earlier meeting—one concededly protected by the First and Fourteenth Amendments— by notifying Williams that the ACLU would be interested in supporting possible litigation. The letter imparted additional information material to making an informed decision about whether to authorize litigation, and permitted Williams an opportunity, which she exercised, for arriving at a deliberate decision. The letter was not facially misleading; indeed, it offered "to explain what is involved so you can understand what is going on." The transmittal of this letter—as contrasted with in-person solicitation—involved no appreciable invasion of privacy; [28] nor did it afford any significant opportunity for overreaching or coercion. Moreover, the fact that there was a written communication lessens substantially the

---

[28] This record does not provide a constitutionally adequate basis for a finding, not made below, that appellant deliberately thrust her professional services on an individual who had communicated unambiguously a decision against litigation. Cf. *Rowan* v. *Post Office Dept.*, 397 U. S. 728 (1970). For present purposes, we credit Williams' conflicting testimony to the effect that at the July meeting she told appellant that because of the condition of her child she "didn't have time to think about suing" and "if I needed you all I will call you." App. 74; see n. 7, *supra*. But even on that view of the testimony, appellant's letter cannot be characterized as a pressure tactic. A month had elapsed between the meeting and the letter. Not only was there a possibility that Williams' personal situation might have changed during this period, but appellant testified that Allen, a close friend of the Williams family, told her that Williams subsequently communicated to him an interest in the lawsuit; Allen corroborated this testimony. App. 115–116, 137, 195–196. In light of these circumstances, and Williams' own acknowledgment that appellant "did not attempt to persuade or pressure me to file this lawsuit," *id.*, at 52, appellant did not go beyond the pale of constitutional protection in writing a single letter for the purpose of imparting new information material to a decision whether or not to authorize litigation, and inquiring "if you are interested, let me know, and I'll let you know when we will come down to talk to you about it."

difficulty of policing solicitation practices that do offend valid rules of professional conduct. See *Ohralik, post,* at 466–467. The manner of solicitation in this case certainly was no more likely to cause harmful consequences than the activity considered in *Button,* see n. 14, *supra.*

Nor does the record permit a finding of a serious likelihood of conflict of interest or injurious lay interference with the attorney-client relationship. Admittedly, there is some potential for such conflict or interference whenever a lay organization supports any litigation. That potential was present in *Button,* in the NAACP's solicitation of nonmembers and its disavowal of any relief short of full integration, see 371 U. S., at 420; *id.,* at 460, 465 (Harlan, J., dissenting). But the Court found that potential insufficient in the absence of proof of a "serious danger" of conflict of interest, *id.,* at 443, or of organizational interference with the actual conduct of the litigation, *id.,* at 433, 444. As in *Button,* "[n]othing that this record shows as to the nature and purpose of [ACLU] activities permits an inference of any injurious intervention in or control of litigation which would constitutionally authorize the application," *id.,* at 444, of the Disciplinary Rules to appellant's activity.[29] A "very distant possibility of harm," *Mine Workers* v. *Illinois Bar Assn.,* 389 U. S., at 223, cannot justify proscription of the activity of appellant revealed by this record. See *id.,* at 223–224.[30]

The State's interests in preventing the "stirring up" of frivolous or vexatious litigation and minimizing commerciali-

---

[29] Although the decision whether or not to support a particular litigation is made in accordance with the ACLU's broader objectives, the organization's declared policy is to avoid all interference with the attorney-client relationship after that decision has been made. See 1976 Policy Guide of the American Civil Liberties Union, Policy #513, p. 305.

[30] We are not presented in this case with a situation where the income of the lawyer who solicits the prospective litigant or who engages in the actual representation of the solicited client rises or falls with the outcome of the particular litigation. See *supra,* at 428–431, and n. 24.

zation of the legal profession offer no further justification for the discipline administered in this case. The *Button* Court declined to accept the proffered analogy to the common-law offenses of maintenance, champerty, and barratry, where the record would not support a finding that the litigant was solicited for a malicious purpose or "for private gain, serving no public interest," 371 U. S., at 440; see *id.*, at 439–444. The same result follows from the facts of this case. And considerations of undue commercialization of the legal profession are of marginal force where, as here, a nonprofit organization offers its services free of charge to individuals who may be in need of legal assistance and may lack the financial means and sophistication necessary to tap alternative sources of such aid.[31]

At bottom, the case against appellant rests on the proposition that a State may regulate in a prophylactic fashion all solicitation activities of lawyers because there may be some potential for overreaching, conflict of interest, or other substantive evils whenever a lawyer gives unsolicited advice and communicates an offer of representation to a layman. Under certain circumstances, that approach is appropriate in the case of speech that simply "propose[s] a commercial transaction," *Pittsburgh Press Co.* v. *Human Relations Comm'n,* 413 U. S. 376, 385 (1973). See *Ohralik, post,* at 455–459. In the con-

---

[31] *Button* makes clear that "regulations which reflect hostility to stirring up litigation have been aimed chiefly at those who urge recourse to the courts for private gain, serving no public interest," 371 U. S., at 440, and that "[o]bjection to the intervention of a lay intermediary . . . also derives from the element of pecuniary gain," *id.*, at 441. In recognition of the overarching obligation of the lawyer to serve the community, see Canon 2 of the ABA Code of Professional Responsibility, the ethical rules of the legal profession traditionally have recognized an exception from any general ban on solicitation for offers of representation, without charge, extended to individuals who may be unable to obtain legal assistance on their own. See, *e. g., In re Ades,* 6 F. Supp. 467, 475–476 (Md. 1934); *Gunnels* v. *Atlanta Bar Assn.,* 191 Ga. 366, 12 S. E. 2d 602 (1940); American Bar Association, Opinions of the Committee on Professional Ethics, Formal Opinion 148, pp. 416–419 (1967).

text of political expression and association, however, a State must regulate with significantly greater precision.[32]

## VI

The State is free to fashion reasonable restrictions with respect to the time, place, and manner of solicitation by members of its Bar. See *Bates* v. *State Bar of Arizona*, 433 U. S., at 384; *Virginia Pharmacy Board* v. *Virginia Consumer Council*, 425 U. S., at 771, and cases cited therein. The State's special interest in regulating members of a profession it licenses, and who serve as officers of its courts, amply justifies the application of narrowly drawn rules to proscribe solicitation that in fact is misleading, overbearing, or involves other features of deception or improper influence.[33] As we decide today in

[32] Normally the purpose or motive of the speaker is not central to First Amendment protection, but it does bear on the distinction between conduct that is "an associational aspect of 'expression'," Emerson, Freedom of Association and Freedom of Expression, 74 Yale L. J. 1, 26 (1964), and other activity subject to plenary regulation by government. *Button* recognized that certain forms of "cooperative, organizational activity," 371 U. S., at 430, including litigation, are part of the "freedom to engage in association for the advancement of beliefs and ideas," *NAACP* v. *Alabama*, 357 U. S. 449, 460 (1958), and that this freedom is an implicit guarantee of the First Amendment. See *Healy* v. *James*, 408 U. S. 169, 181 (1972). As shown above, appellant's speech—as part of associational activity—was expression intended to advance "beliefs and ideas." In *Ohralik* v. *Ohio State Bar Assn., post*, p. 447, the lawyer was not engaged in associational activity for the advancement of beliefs and ideas; his purpose was the advancement of his own commercial interests. The line, based in part on the motive of the speaker and the character of the expressive activity, will not always be easy to draw, cf. *Virginia Pharmacy Board* v. *Virginia Consumer Council*, 425 U. S. 748, 787–788 (1976) (REHNQUIST, J., dissenting), but that is no reason for avoiding the undertaking.

[33] We have no occasion here to delineate the precise contours of permissible state regulation. Thus, for example, a different situation might be presented if an innocent or merely negligent misstatement were made by a lawyer on behalf of an organization engaged in furthering associational or political interests.

*Ohralik*, a State also may forbid in-person solicitation for pecuniary gain under circumstances likely to result in these evils. And a State may insist that lawyers not solicit on behalf of lay organizations that exert control over the actual conduct of any ensuing litigation. See *Button*, 371 U. S., at 447 (WHITE, J., concurring in part and dissenting in part). Accordingly, nothing in this opinion should be read to foreclose carefully tailored regulation that does not abridge unnecessarily the associational freedom of nonprofit organizations, or their members, having characteristics like those of the NAACP or the ACLU.

We conclude that South Carolina's application of DR 2–103 (D)(5)(a) and (c) and 2–104 (A)(5) to appellant's solicitation by letter on behalf of the ACLU violates the First and Fourteenth Amendments. The judgment of the Supreme Court of South Carolina is

*Reversed.*

MR. JUSTICE BRENNAN took no part in the consideration or decision of this case.

[For opinion of MR. JUSTICE MARSHALL, concurring in part and concurring in the judgment, see *post*, p. 468.]

MR. JUSTICE BLACKMUN, concurring.

Although I join the opinion of the Court, my understanding of the first paragraph of Part VI requires further explanation. The dicta contained in that paragraph are unnecessary to the decision of this case and its First Amendment overtones. I, for one, am not now able to delineate in the area of political solicitation the extent of state authority to proscribe misleading statements. Despite the positive language of the text,*

---

*"'The State's special interest in regulating members of a profession it licenses, and who serve as officers of its courts, amply justifies the application of narrowly drawn rules to proscribe solicitation that in fact is misleading . . . .'" *Ante*, at 438.

footnote 33 explains that the Court also has refused to draw a line regarding misrepresentation:

> "We have no occasion here to delineate the precise contours of permissible state regulation. Thus, for example, a different situation might be presented if an innocent or merely negligent misstatement were made by a lawyer on behalf of an organization engaged in furthering associational or political interests."

It may well be that the State is able to proscribe such solicitation. The resolution of that issue, however, requires a balancing of the State's interests against the important First Amendment values that may lurk in even a negligent misstatement. The Court wisely has postponed this task until an appropriate case is presented and full arguments are carefully considered.

MR. JUSTICE REHNQUIST, dissenting.

In this case and the companion case of *Ohralik* v. *Ohio State Bar Assn.*, *post*, p. 447, the Court tells its own tale of two lawyers: One tale ends happily for the lawyer and one does not. If we were given the latitude of novelists in deciding between happy and unhappy endings for the heroes and villains of our tales, I might well join in the Court's disposition of both cases. But under our federal system it is for the States to decide which lawyers shall be admitted to the Bar and remain there; this Court may interfere only if the State's decision is rendered impermissible by the United States Constitution. We can, of course, develop a jurisprudence of epithets and slogans in this area, in which "ambulance chasers" suffer one fate and "civil liberties lawyers" another. But I remain unpersuaded by the Court's opinions in these two cases that there is a principled basis for concluding that the First and Fourteenth Amendments forbid South Carolina from disciplining Primus here, but permit Ohio to discipline Ohralik

in the companion case. I believe that both South Carolina and Ohio acted within the limits prescribed by those Amendments, and I would therefore affirm the judgment in each case.

This Court said in *United Transportation Union* v. *Michigan Bar,* 401 U. S. 576, 585 (1971): "The common thread running through our decisions in *NAACP* v. *Button,* [371 U. S. 415 (1963),] *Trainmen* [v. *Virginia Bar,* 377 U. S. 1 (1964),] and *United Mine Workers* [v. *Illinois Bar Assn.,* 389 U. S. 217 (1967),] is that collective activity undertaken to obtain meaningful access to the courts is a fundamental right within the protection of the First Amendment." The Court today ignores the absence of this common thread from the fabric of this case, and decides that South Carolina may not constitutionally discipline a member of its Bar for badgering a lay citizen to take part in "collective activity" which she has never desired to join.

Neither *Button* nor any other decision of this Court compels a State to permit an attorney to engage in uninvited solicitation on an individual basis. Further, I agree with the Court's statement in the companion case that the State has a strong interest in forestalling the evils that result "when a lawyer, a professional trained in the art of persuasion, personally solicits an unsophisticated, injured, or distressed lay person." *Ohralik, post,* at 465. The reversal of the judgment of the Supreme Court of South Carolina thus seems to me quite unsupported by previous decisions or by any principle which may be abstracted from them.

In distinguishing between Primus' protected solicitation and Ohralik's unprotected solicitation, the Court lamely declares: "We have not discarded the 'common-sense' distinction between speech proposing a commercial transaction, which occurs in an area traditionally subject to government regulation, and other varieties of speech." *Post,* at 455–456. Yet to the extent that this "common-sense" distinction focuses on the content of the speech, it is at least suspect under many of

this Court's First Amendment cases, see, *e. g., Police Dept. of Chicago* v. *Mosley,* 408 U. S. 92, 96–98 (1972), and to the extent it focuses upon the motive of the speaker, it is subject to manipulation by clever practitioners. If Albert Ohralik, like Edna Primus, viewed litigation " 'not [as] a technique of resolving private differences,' " but as " 'a form of political expression' and 'political association,' " *ante,* at 428, quoting *Button, supra,* at 429, 431, for all that appears he would be restored to his right to practice. And we may be sure that the next lawyer in Ohralik's shoes who is disciplined for similar conduct will come here cloaked in the prescribed mantle of "political association" to assure that insurance companies do not take unfair advantage of policyholders.

This absence of any principled distinction between the two cases is made all the more unfortunate by the radical difference in scrutiny brought to bear upon state regulation in each area. Where solicitation proposes merely a commercial transaction, the Court recognizes "the need for prophylactic regulation in furtherance of the State's interest in protecting the lay public." *Ohralik, post,* at 468. On the other hand, in some circumstances (at least in those identical to the instant case)[1] "[w]here political expression or association is at

---

[1] The Court carefully reserves judgment on factual circumstances in any way distinguishable from those presented here. For instance, the Court suggests that different considerations would arise if Primus herself had received any benefit from the solicitation, or if her income depended in any way on the outcome of the litigation. *Ante,* at 428–429, n. 21, 436 n. 30. Likewise, the Court emphasizes that the lawyers conducting the litigation would have taken no share had attorney's fees been awarded by the court. *Ante,* at 430 n. 24. Finally, the Court points out that Williams had not "communicated unambiguously a decision against litigation," *ante,* at 435 n. 28, that the solicitation was not effected in person, *ante,* at 435, and that legal services were offered free of charge, *ante,* at 437. All these reservations seem to imply that a State might be able to raise an absolute prohibition against any of these factual variations, even "[i]n the context of political expression and association." *Ante,* at 437–438. But see *ante,* p. 439 (BLACKMUN, J., concurring). On the other hand, in

issue," a member of the Bar "may not be disciplined unless her activity in fact involve[s] the type of misconduct at which South Carolina's broad prohibition is said to be directed." *Ante,* at 434.

I do not believe that any State will be able to determine with confidence the area in which it may regulate prophylactically and the area in which it may regulate only upon a specific showing of harm. Despite the Court's assertion to the contrary, *ante,* at 438 n. 32, the difficulty of drawing distinctions on the basis of the content of the speech or the motive of the speaker *is* a valid reason for avoiding the undertaking where a more objective standard is readily available. I believe that constitutional inquiry must focus on the character of the conduct which the State seeks to regulate, and not on the motives of the individual lawyers or the nature of the particular litigation involved. The State is empowered to discipline for conduct which it deems detrimental to the public interest unless foreclosed from doing so by our cases construing the First and Fourteenth Amendments.

In *Button* this Court recognized the right of the National Association for the Advancement of Colored People to engage in collective activity, including the solicitation of potential plaintiffs from outside its ranks, for the purpose of instituting and maintaining litigation to achieve the desegregation of public schools. The NAACP utilized letters, bulletins, and petition drives, 371 U. S., at 422, apparently directed toward both members and nonmembers of the organization, *id.,* at 433,[2] to organize public meetings for the purpose of soliciting

---

*Ohralik, post,* at 463 n. 20, the Court appears to give a broader reading to today's holding. "We hold today in *Primus* that a lawyer who engages in solicitation as a form of protected political association generally may not be disciplined without proof of actual wrongdoing that the State constitutionally may proscribe."

[2] Of all our cases recognizing the protected status of "collective activity undertaken to obtain meaningful access to the courts," *United Transporta-*

plaintiffs. As described in *Button*, lawyers played only a limited role in this solicitation:

"Typically, a local NAACP branch will invite a member of the legal staff to explain to a meeting of parents and children the legal steps necessary to achieve desegregation. The staff member will bring printed forms to the meeting, authorizing him, and other NAACP or Defense Fund attorneys of his designation, to represent the signers in legal proceedings to achieve desegregation." *Id.*, at 421.

The Court held that the organization could not be punished by the Commonwealth of Virginia for solicitation on the basis of its role in instituting desegregation litigation.[3]

Here, South Carolina has not attempted to punish the ACLU or any laymen associated with it. Gary Allen, who was the instigator of the effort to sue Dr. Pierce, remains as free as before to solicit potential plaintiffs for future litigation. Likewise, Primus remains as free as before to address gatherings of the sort described in *Button* to advise potential plaintiffs of their legal rights. Primus' first contact with Williams took place at such a gathering, and South Carolina, evidently in response to *Button*, has not attempted to disci-

---

*tion Union* v. *Michigan Bar*, 401 U. S. 576, 585 (1971), only *Button* involves the solicitation of nonmembers of the organization. See *United Transportation Union, supra*, at 577–578; *Mine Workers* v. *Illinois Bar Assn.*, 389 U. S. 217, 218 (1967); *Railroad Trainmen* v. *Virginia Bar*, 377 U. S. 1, 7 (1964).

[3] In *Button* the Commonwealth did not attempt to discipline the individual lawyers for their role in the solicitation. The Court's statement that "the activities of the . . . legal staff shown on this record are modes of expression and association protected by the First and Fourteenth Amendments which Virginia may not prohibit," 371 U. S., at 428–429, is therefore technically dictum. Thus, the Court's conclusion today that a State may not discipline a member of its Bar for soliciting an individual not already engaged in the sort of collective activity protected under our cases is as unprecedented as it is unsound.

pline her for her part in that meeting. It has disciplined her for initiating further contact on an individual basis with Williams, who had not expressed any desire to become involved in the collective activity being organized by the ACLU. While *Button* appears to permit such individual solicitation for political purposes by lay members of the organization, *id.*, at 422, it nowhere explicitly permits such activity on the part of lawyers.

As the Court understands the Disciplinary Rule enforced by South Carolina, "a lawyer employed by the ACLU or a similar organization may never give unsolicited advice to a lay person that he or she retain the organization's free services." *Ante,* at 433. That prohibition seems to me entirely reasonable. A State may rightly fear that members of its Bar have powers of persuasion not possessed by laymen, s;e *Ohralik, post,* at 464–465, and it may also fear that such persuasion may be as potent in writing as it is in person. Such persuasion may draw an unsophisticated layman into litigation contrary to his own best interests, compare *ante,* at 434–438, with *Ohralik, post,* at 464–467, and it may force other citizens of South Carolina to defend against baseless litigation which would not otherwise have been brought. I cannot agree that a State must prove such harmful consequences in each case simply because an organization such as the ACLU or the NAACP is involved.

I cannot share the Court's confidence that the danger of such consequences is minimized simply because a lawyer proceeds from political conviction rather than for pecuniary gain. A State may reasonably fear that a lawyer's desire to resolve "substantial civil liberties questions," 268 S. C. 259, 263, 233 S. E. 2d 301, 303 (1977), may occasionally take precedence over his duty to advance the interests of his client. It is even more reasonable to fear that a lawyer in such circumstances will be inclined to pursue both culpable and blameless defendants to the last ditch in order to achieve his

ideological goals.[4]  Although individual litigants, including the ACLU, may be free to use the courts for such purposes, South Carolina is likewise free to restrict the activities of the members of its Bar who attempt to persuade them to do so.

I can only conclude that the discipline imposed upon Primus does not violate the Constitution, and I would affirm the judgment of the Supreme Court of South Carolina.

---

[4] In the case with which Primus was concerned, the last ditch was the denial of certiorari in this Court after the Court of Appeals for the Fourth Circuit had held that Pierce had not in fact acted under color of state law.  *Walker* v. *Pierce,* 560 F. 2d 609 (CA4 1977), cert. denied, 434 U. S. 1075 (1978).