DEVELOPMENTAL DISABILITIES
ADVOCACY CENTER, INC.,
Plaintiff, Appellant,

and

Harold Tuttle, et al., Plaintiffs,
Appellees,

v.

Jack MELTON, et al., Defendants,
Appellees.

DEVELOPMENTAL DISABILITIES
ADVOCACY CENTER, INC.,
Plaintiff, Appellee,

and

Harold Tuttle, et al., Plaintiffs,
Appellants,

v.

Jack MELTON, et al., Defendants,
Appellees.

Nos. 81–1727, 81–1755.

United States Court of Appeals,
First Circuit.

Argued May 4, 1982.

Decided Sept. 22, 1982.

Kenneth M. Brown, Nashua, N. H., with whom Kahn, Brown & Bruno, Nashua, N. H., was on brief, for plaintiffs, appellants Harold Tuttle, Alice Graham and Lillian Cooke.

Ronald K. Lospennato, St. Johnsbury, Vt., with whom M. Elaine Beauchesne, Penacook, N. H., was on brief, for plaintiff, appellant Developmental Disabilities Advocacy Center, Inc.

James E. Townsend, Asst. Atty. Gen., Concord, N. H., with whom Gregory H. Smith, Atty. Gen., Peter C. Scott, Asst. Atty. Gen., and Loretta S. Platt, Atty., Division of Legal Counsel, Concord, N. H., were on brief, for defendants, appellees Jack Melton and Gary Miller.

Robert D. Fleischner, Steven J. Schwartz, William Crane, Richard Howard, and Carol Booth, on brief for Mental Patients Advocacy Project and Developmental Disabilities Law Center, amici curiae.

Richard A. Cohen, Manchester, N. H., John D. MacIntosh, and New Hampshire Legal Assistance, Concord, N. H., on brief for New Hampshire Association for Retarded Citizens, amicus curiae.

Joseph H. Rodriguez, Camden, N. J., Herbert D. Hinkle and R. Michael Kemler, Asst. Deputy Public Advocate, Trenton, N. J., on brief for National Ass'n of Protection and Advocacy Systems, amicus curiae.

Before ALDRICH, CAMPBELL and BREYER, Circuit Judges.

LEVIN H. CAMPBELL, Circuit Judge.

The Developmental Disabilities Advocacy Center [1] ("DDAC") and "next friend" Freda Smith (suing on behalf of three residents [2] of New Hampshire's Laconia State School and Training Center ("LSS")) appeal from the district court's dismissal of their suit brought pursuant to 42 U.S.C. § 1983. In the suit plaintiffs sought injunctive and declaratory relief to prevent LSS officials from curtailing visits between DDAC lawyers and mentally retarded residents living at LSS.[3] After a day-long hearing on plaintiffs' motion for preliminary injunction and defendants' Rule 12(b) motion to dismiss for failure to state a claim, the court found that all the plaintiffs lacked "standing to challenge the visitation regulations of LSS" and granted the motion to dismiss. The court also denied plaintiffs' request to certify the suit as a class action.

I.

LSS is New Hampshire's only state institution for the mentally retarded. Located

---

1. DDAC is an independent state organization which was created pursuant to federal statute in 1979. The enabling legislation, 42 U.S.C. § 6012, made creation of such state advocacy groups a condition of receiving federal funds for developmental disability programs. Section 6012 of the statute provides, in part, that:

> (a) In order for a State to receive an allotment ... (1) the State must have in effect a system to protect and advocate the rights of persons with developmental disabilities, (2) such system must (A) have the authority to pursue legal, administrative, and other appropriate remedies to ensure the protection of the rights of such persons who are receiving treatment, services, or habilitation within the State, (B) not be administered by the State Planning Council, and (C) be independent of any agency which provides treatment, services, or habilitation to persons with developmental disabilities....

2. Freda Smith originally sued on behalf of LSS residents Bruce Spinney, Harold Tuttle, Alice Graham and Lillian Cooke. The district court found the case moot as to Bruce Spinney—a finding not disputed on appeal. The present appeal, therefore, involves claims only as to Tuttle, Graham and Cooke. Cooke no longer resides at LSS, though her records apparently remain there.

3. The DDAC grounded its claims below in the first amendment and the Developmental Disabilities Assistance and Bill of Rights Act ("DD Act"), 42 U.S.C. §§ 6001 et seq. On appeal, it presses only its first amendment claim. The named plaintiffs, through Freda Smith, sued under the first amendment, the due process and equal protection clauses, the DD Act, and the Rehabilitation Act of 1973. They continue to press these claims on appeal.

in the country, it housed about 550 residents in 1980. Seventy percent of the residents are "severely" (I.Q. of 20–35) or "profoundly" (I.Q. of less than 20) retarded. About 20 percent are "moderately" (I.Q. of 36–51) retarded and the remaining 10 percent are either "mildly" retarded (I.Q. of 52–69) or "borderline" (I.Q. over 69). *See Garrity v. Gallen,* 522 F.Supp. 171, 177 n.18, 180 (D.N. H.1981).

In 1978, six mentally retarded residents of LSS brought a class action in the district court charging that the conditions at the school violated the constitutional and statutory rights of the residents. Freda Smith, as the parent of a retarded child who had resided at LSS, and the DDAC, as an *amicus,* were involved in this suit, which resulted in a broad remedial order by the district court[4] to rectify a number of found violations. As a part of this order, the district court authorized plaintiffs' attorneys (New Hampshire Legal Assistance) to enter LSS in order to monitor compliance. The order also required LSS to institute guardianship proceedings for many residents and to make major changes in its educational and community placement policies. *See generally Garrity v. Gallen, supra.*

During and after this lawsuit, the number of visitors to LSS's buildings—particularly lawyers and investigators—vastly increased. Among the frequent visitors were a law student and staff attorney employed by DDAC. Lacking any formal rules regarding visitors of this or of any other sort, LSS formulated a policy in the fall of 1980 of requiring all visitors to report initially to the reception area (lawyers had formerly been going directly to residential buildings and mixing freely with residents). At the reception area, lawyers were required to show authorization from a court, a guardi-

an, or the resident they wished to visit. Any complaints and appeals regarding denials of a visit were to be directed to the state Attorney General's office.

At DDAC's request, these initial, internally developed rules were expanded and codified in a series of draft regulations progressively issued in May, July and December of 1981 and culminating in formal state rulemaking and final regulations issued in February of 1982. The DDAC and Freda Smith filed this lawsuit challenging LSS visitation policies while this rulemaking process was still underway, and before it was completed. The district court had before it only a preliminary draft of the rules, dated July 17, 1981, at the time it issued the opinion which is the subject of this appeal. The December draft was later added to the record of this appeal in the apparent belief that it would aid us in our consideration of the case. However, the final and controlling version, issued in February 1982, is not before us. Appellees insist that the final regulations are not "substantially" different from earlier drafts although appellants contest this.

Insofar as we can tell from the draft regulations now in the record, the visitation rules expressly recognize a resident's right to be visited at all reasonable times unless the superintendent of LSS determines that a visit will "adversely affect" the resident, or unless the resident himself, a guardian, or a parent of a minor client declines to allow a visit.[5] Parents, guardians, court-appointed lawyers and any other person authorized by a court are permitted to visit freely with residents with whom they have ongoing relationships. In certain limited cases,[6] the superintendent is empowered to set visitation terms and conditions which he

---

4. The district judge in the *Garrity* case is the same judge whose judgment is appealed in the present action.

5. Appellees state that the term "adversely affect," although not defined in the December draft regulations, is defined in the final version as "to present a serious likelihood of physical harm to a client or clients."

6. The rules mention this power only in connection with visits to what LSS calls "clinically incompetent" individuals—i.e., those residents who have been deemed incompetent by an interdisciplinary team at the school but who have not yet had formal guardians appointed. It would appear that this condition might also apply to minors or wards whose parents or guardians do not respond in any way to a visitation request.

deems necessary to protect the client. Appeals from denials of visits are available through the LSS "complaint procedure." [7] The regulations in general appear to comport closely with New Hampshire statutory law, which grants to developmentally disabled persons "the right to be visited at all reasonable times" unless a visit would "adversely affect" them. N.H.Rev.Stat.Ann. § 171–A:14 III. There is nothing in the New Hampshire statutory law governing the rights of the developmentally disabled, however, which appears to specifically empower parents and guardians, as such, to deny a visit between the child or ward and an outside party.

Plaintiffs chiefly object to provisions in the regulations which give the parent or guardian of a minor or incompetent resident the ability to prevent a visit between the child or ward and a DDAC attorney. They also take issue with LSS's policies regarding so-called "clinically incompetent" individuals, and with the power of LSS to set terms and conditions on a visit (such as requiring that an LSS staff member be present at an interview). See note 6, supra. The individual plaintiffs claim independent constitutional and statutory rights to speak to DDAC attorneys without restrictions by LSS or their guardians. DDAC argues that, subject only to reasonable time, place, and manner restrictions, the DDAC attorneys should have unlimited access, as they apparently did prior to 1980, to both LSS residents and to their medical and other

records. Only in this way, DDAC asserts, can it adequately discover when residents' rights are being violated and institute appropriate formal and informal proceedings to vindicate those rights as required by federal statute. See 42 U.S.C. § 6012; note 1, supra.

The district court did not finally determine the merits of any of these claims. It held instead that neither Freda Smith nor DDAC had "standing" to press these issues. We review, therefore, the matter of plaintiffs' standing, dealing first with Freda Smith's right to bring suit as "next friend" to LSS residents Harold Tuttle, Alice Graham, and Lillian Cooke.

## II. Freda Smith as "Next Friend"

The district court found that Freda Smith, though an activist in LSS affairs who "probably knew" the individuals on whose behalf she sought to sue,[8] nevertheless lacked standing to sue on behalf of Tuttle, Graham, and Cooke. The court was particularly concerned that Smith had proceeded in this action "without receiving authority from the purported client." [9] We do not think the district court erred in so holding.

The Federal Rules of Civil Procedure provide for cases in which parties may sue by a "next friend" or guardian ad litem. See Fed.R.Civ.P. 17(c). Rule 17(c) reads as follows:

7. Appeal is also available by statute to the Human Rights Committee, a state review body created to protect the rights of the developmentally disabled. N.H.Rev.Stat.Ann. 171–A:14 III.

8. Smith testified that she could not recall having been specifically introduced to Tuttle, Graham, or Cooke, but she felt sure she had seen them at one time or another during her association with LSS.

9. Smith's sole efforts in the direction of contacting the affected guardians in this case were apparently letters from her lawyer, Kenneth Brown, to Tuttle's and Graham's legal guardians announcing that he "represented" Tuttle and Graham in the present suit and indicating the time and place of the district court hearing. There was no indication in the record that Smith or attorney Brown had ever communi-

cated in any way—by letter or otherwise—with Lillian Cooke, a resident who, while legally competent, had been found by an LSS interdisciplinary team to be clinically incapable of managing her affairs. Cooke has subsequently been placed in a community residential setting outside of LSS, as discussed infra. That such communications with guardians or residents is possible is evidenced by the fact that Smith spoke with Bruce Spinney's guardian and received his permission both to represent Spinney and to visit him at LSS, thus mooting his case in the present appeal. See note 2, supra. Cooke, meanwhile, was visited at LSS by DDAC, though the school required that a nurse attend the interview and indicated that it would not recognize any signed authorization by Ms. Cooke releasing her records.

(c) Infants or Incompetent Persons. Whenever an infant or incompetent person has a representative, such as a general guardian, committee, conservator, or other like fiduciary, the representative may sue or defend on behalf of the infant or incompetent person. If an infant or incompetent person does not have a duly appointed representative he may sue by his next friend or by a guardian ad litem. The court shall appoint a guardian ad litem for an infant or incompetent person not otherwise represented in an action or shall make such other order as it deems proper for the protection of the infant or incompetent person.

Since each of the three residents alleged to be represented by Freda Smith presents a slightly different situation,[10] we review Smith's status with respect to each resident individually, bearing in mind that the capacity of one to sue as a representative of another is usually determined by state law. 3A *Moore's Federal Practice* ¶ 17.26 at 17–272, 17–273.

### A. Harold Tuttle

Harold Tuttle was a 17-year-old minor resident at the time this suit was brought. His mother is his natural guardian, and she apparently expressly disapproved of the present action by Freda Smith.[11] New Hampshire courts recognize the preeminent position of parents as natural guardians of their children. In *In re Penny*, 120 N.H. 269, 414 A.2d 541 (1980), a case involving the rights and duties of parents of developmentally disabled children, the New Hampshire Supreme Court held that "parental rights relating to custody and care of minor children occur naturally in our society and are prior to the State itself." *Id.* at 270, 414 A.2d at 542. The court went on to hold that a natural parent could give authorization for a sterilization operation of her retarded child without formal appointment by a court as the child's legal "guardian." We think *In re Penny* indicates that New

Hampshire would recognize Harold's mother as his "representative . . . or other like fiduciary" and that, under Rule 17(c), a federal district court would recognize her standing to bring an action such as the present one should she deem it necessary to protect her child's best interests. Freda Smith, however, having no such natural or other official relationship to Harold, has no standing to sue under this first sentence of Rule 17(c).

■ The rule also allows suits by a next friend or guardian ad litem when there is an absence of a "duly appointed representative." Since Harold's mother is a "natural" rather than a "duly appointed" fiduciary, a court could arguably consider appointment of Freda Smith as next friend under the rule should the circumstances of the case warrant such an action. The district court need not appoint such a special representative, however, unless, in the words of the rule, the "infant or incompetent person [is] not otherwise represented in an action. . . ." This language has generally been interpreted by the courts as permitting appointment of a next friend or guardian ad litem "when it appears that the minor's general representative has interests which may conflict with those of the person he is supposed to represent." *Hoffert v. General Motors Corp.*, 656 F.2d 161, 164 (5th Cir. 1981), *cert. denied,* —— U.S. ——, 102 S.Ct. 2037, 72 L.Ed.2d 485 (1982). The decision as to whether or not to appoint such a special representative rests with the sound discretion of the district court and will not be disturbed unless there has been an abuse of its authority. *Id.; 3A Moore's Federal Practice* ¶ 17.26 at 17–280; 6 Wright & Miller, *Federal Practice & Procedure: Civil* § 1570 at 775.

■ We do not think that the district court erred in this case in declining to recognize Freda Smith as "next friend" to Harold Tuttle. Freda Smith at no time

---

10. Since we agree with the district court that each case *is* different, we would accordingly affirm its denial of class certification in this case.

11. Harold's stepfather called Freda Smith's attorney when he learned of the suit and informed him that the family wanted no part of it.

"requested," as required under N.H.Rev. Stat.Ann. § 464–A:41, appointment as next friend. Moreover, while it seems clear that Harold's mother disagreed with Freda Smith over the wisdom of the present suit, there is no indication in the record that she abused her trust in doing so.[12] We therefore think the district court acted within its authority when it found, in effect, that Harold Tuttle was "otherwise represented" by his mother and that no suit by a next friend was authorized.

### B. Alice Graham

Alice Graham is a 62-year-old woman who has been adjudicated incompetent and whose brother, James, has been duly appointed to be her guardian. Like Tuttle's mother, James has indicated his disapproval of the present suit. In such circumstances, where an incompetent person already has a "duly appointed representative," Rule 17(c) would appear to preclude suit by a next friend. New Hampshire law also points in this direction. See Carbonneau v. Hoosier Engineering Co., 96 N.H. 240, 242, 73 A.2d 802 (1950) ("[I]n the absence of a duly appointed guardian" next friend may sue on behalf of incompetent.).

Rule 17(c), however, empowers the district court to "make such other orders as it deems proper for the protection of incompetent person." This language been interpreted to confer authority to appoint a special guardian ad litem or next friend where it is clear that the interests of the "duly appointed" guardian and the ward conflict. 6 Wright & Miller, Federal Practice & Procedure: Civil § 1570 at 774. As is the case where an appointment is sought by a next friend because the incompetent is not "otherwise represented," however, the decision to appoint or not to appoint for "protective" purposes is a matter of trial court discretion. Clearly there was no abuse of such discretion in Alice Graham's case.

As with Harold Tuttle, Freda Smith never requested appointment as "next friend" to Alice Graham as required by New Hampshire law. Additionally, there was a lack of compelling evidence in the record that James Graham had abused his trust in refusing to endorse Freda Smith's suit.[13] Given these factors, we do not think that the district court was required under Rule 17(c) to recognize Freda Smith as "next friend" to Alice Graham.

### C. Lillian Cooke

 Lillian Cooke is the final resident whom Freda Smith seeks to represent. Lil-

---

**12.** There was evidence that Harold had recently undergone an operation to amputate both of his legs. The purpose of the operation was explored at the district court hearing, and the court was evidently satisfied that Harold's mother had acted in the best interest of her child when, on medical advice, she authorized the operation. Harold had suffered from a condition, present from birth, through which he lacked any sensation in either leg. As a result of this, he had inflicted numerous fractures on himself. Three orthopedic surgeons recommended amputation as the most effective treatment and Harold's mother, upon this advice, gave her authorization for the operation. As a result of the amputations, the district court found that Harold's condition and attitude markedly improved.

In the closest case cited by Freda Smith to support her representation of Harold Tuttle, Child v. Beame, 412 F.Supp. 593 (S.D.N.Y. 1976), the court permitted an attorney to sue as "next friend" to five children in a juvenile institution to challenge various placement practices. In that case, however, the "next friend" not only had the express permission of the children to sue but alleged that "their parents have abandoned all interest in them." Neither factor is present in this case.

**13.** Apparently Alice Graham sought DDAC assistance to be placed in a community setting—a situation she had tried previously with unhappy results. A social worker at LSS testified that while Graham was in her prior community placement she "did not eat her meals, change her clothes or take medication or want to get involved in programming, and the last straw, I guess—and Jane Gray was where she was staying—the last straw from that woman's perspective was Alice tore her door off its hinges...." Apparently because of this experience, James Graham opposed a new placement for Alice. LSS officials indicated that, if Alice's best interests warranted it, however, James's wishes could be overridden. The subject of a new community placement for Alice Graham had been considered on a number of occasions by LSS staff even without the assistance of DDAC.

lian Cooke has no guardian but, at the time of the action, had been deemed "clinically incompetent" by an LSS interdisciplinary team pursuant to N.H.Rev.Stat.Ann. § 171–A:10 II (1980 Supp.).[14] She apparently sought DDAC's assistance in order to effectuate a community placement. LSS permitted a DDAC staff member to interview Ms. Cooke, but the school insisted that an LSS staffer be present at the interview and informed DDAC that it would not honor her signature on any consent form giving DDAC access to her records. Prior to the filing of the action below, however, Ms. Cooke received a community placement and, as of the date of this appeal, she no longer resides at LSS. In view of the fact that Ms. Cooke does not—and did not at the time of the district court's decision—reside at LSS, we think the present action is moot as to her. Whatever interests Lillian may have in LSS's access policies as a former or possible future LSS resident, she may adequately protect them when she has a live controversy to present to a court. We accordingly affirm the district court's dismissal of Freda Smith's suit on Lillian Cooke's behalf, as well as her action on behalf of Harold Tuttle and Alice Graham.

### III. DDAC's Standing

The question of DDAC's standing to pursue its action raises an entirely different type of issue. DDAC asserts that LSS's visitation rules infringe its own organizational rights as a legal advocacy group to effectively communicate with a population it was created to serve—developmentally disabled individuals residing at LSS. DDAC grounds its claim in the first amendment to the United States Constitution. While we express no views as to the merits of this claim, we disagree with the district court's conclusion that DDAC lacked "standing" to present such a claim and to have it considered. Accordingly we are remanding DDAC's claim for further proceedings below.

DDAC, as noted previously, *see* note 1, *supra,* is a nonprofit legal advocacy group created and funded by the State of New Hampshire pursuant to the DD Act. 42 U.S.C. § 6012. The state, as a condition of receiving federal funds for the developmentally disabled, "must have in effect a system to protect and advocate the rights of persons with developmental disabilities.... " *Id.* DDAC claims that its status as a legal advocacy group gives it first amendment rights, not enjoyed by ordinary practicing lawyers who routinely charge fees for their services, to communicate with retarded residents at LSS regarding their legal rights without being subject to the usual constraints regarding the solicitation of clients or to any undue interference from LSS or the state.

The district court found that no "associational rights" of DDAC were "implicated" by the LSS visitation policies. It went on to hold that neither the DD Act nor New Hampshire state law conferred any special status upon DDAC which would preclude the normal operation of the rule that "direct solicitation of clients by attorneys is still strictly forbidden." It concluded that DDAC lacked "standing" to bring the present action.

■ The district court, however, overlooked an important aspect of DDAC's claim in dismissing its suit for lack of standing. DDAC contends that its own corporate, organizational interest as a nonprofit legal advocacy group with a need to communicate with clients is being directly infringed by the LSS rules. While it may formerly have been that "public interest" law groups such as DDAC enjoyed no greater right to communicate with clients than did private attorneys generally, it is now clear that such legal advocacy organizations have first amendment rights which, in appropriate circumstances, may permit them to seek out clients and initiate litigation. *NAACP v. Button,* 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963). In *NAACP*

---

14. LSS is presently under a federal court order to provide Ms. Cooke with a legal guardian as required by state law. N.H.Rev.Stat.Ann. 171–

A:10 II (1980 Supp.). *See Garrity v. Gallen,* 522 F.Supp. 171 (D.N.H.1981).

*v. Button,* the Supreme Court recognized the right of the NAACP, on its own behalf, to challenge Virginia's lawyer anti-solicitation laws on the grounds that these laws effectively precluded the NAACP from communicating with prospective plaintiffs to civil rights actions and so chilled the organization's first amendment interest in sponsoring litigation to further the interests of black Americans. The Supreme Court stated in *Button* that the NAACP, *as a corporate entity,* had standing to assert its claim on its own behalf "because, though a corporation, it is directly engaged in those activities, claimed to be constitutionally protected, which the statute would curtail." *Id.* at 428, 83 S.Ct. at 335. Subsequent decisions of the Court have relied upon *Button* in recognizing the generalized substantive right of nonprofit legal advocacy groups such as the NAACP and the ACLU to engage in "collective activity undertaken to obtain meaningful access to the courts" for the poor, minorities, and other special constituencies. *United Transportation Union v. Michigan Bar,* 401 U.S. 576, 585, 91 S.Ct. 1076, 1082, 28 L.Ed.2d 339 (1971) (*citing NAACP v. Button, supra* ). *See also In re Primus,* 436 U.S. 412, 425 n.16, 98 S.Ct. 1893, 1901 n.16, 56 L.Ed.2d 417 (1978) (in-person meetings and correspondence between ACLU and prospective clients to advise them of their rights constitutionally protected).

In light of *Button* and its progeny, we think that the DDAC must be held to have *standing* to proceed with this action, whatever its final success may be in establishing a violation of its rights. Like the NAACP, DDAC claims that it "is directly engaged in those activities claimed to be constitutionally protected, which the statute [in this case, the regulations] would curtail." *NAACP v. Button,* 371 U.S. at 428, 83 S.Ct. at 335. For example, DDAC seeks

to speak to residents without regard to the wishes of a parent or guardian. The rules forbid this. DDAC also seeks to conduct its meetings with residents in private—and points to instances when LSS has denied it this privilege. Under the traditional tests for "standing," therefore, DDAC has alleged sufficient "injury in fact" to its interests, *Singleton v. Wulff,* 428 U.S. 106, 112, 96 S.Ct. 2868, 2873, 49 L.Ed.2d 826 (1976), and appears to have the requisite "stake in the outcome" to guarantee a case or controversy. *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 2204, 45 L.Ed.2d 343 (1975), *quoting Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962). Moreover, it has alleged a sufficient "nexus" between DDAC's interest (access to LSS residents) and the rules and practices it seeks to challenge to overcome any prudential barriers to standing. *Flast v. Cohen,* 392 U.S. 83, 102, 88 S.Ct. 1942, 1953, 20 L.Ed.2d 947 (1968).

Given standing, we can see no other basis for cutting off DDAC's right to present its claim at this preliminary stage. DDAC's claim is not so utterly frivolous as to preclude federal jurisdiction, *Bell v. Hood,* 327 U.S. 678, 681–83, 66 S.Ct. 773, 775–76, 90 L.Ed. 939 (1946); *Local 714, Amalgamated Transit Union v. Greater Portland Transit District,* 589 F.2d 1, 5–6 (1st Cir. 1978), *overruled on other grounds, Local 589, Amalgamated Transit Union v. Massachusetts,* 666 F.2d 618 (1st Cir. 1981), *cert. denied,* —— U.S. ——, 102 S.Ct. 2928, 73 L.Ed.2d 1329 (1982), nor so facially deficient as to warrant dismissal under Rule 12(b)(6) for failure to state a claim. *Conley v. Gibson,* 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).[15]

To be sure, DDAC's first amendment claim presents considerations not present in cases such as *NAACP v. Button* and *In re Primus, supra.* In *Button,* NAACP lawyers

---

**15.** The district court also indicated in its opinion that DDAC was barred from bringing its action in federal court until it "exhausted the full panoply of . . . well-crafted [state] legal remedies" available to it under the state guardianship laws. We note, however, that the Supreme Court has recently reiterated that exhaustion of possible state remedies is normally not a prerequisite to bringing a civil rights action under 42 U.S.C. § 1983. *See Patsy v. Florida Board of Regents,* —— U.S. ——, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982). We thus do not think that DDAC is precluded from bringing its suit on exhaustion grounds.

sought to initiate contact with non-institutionalized persons who were legally competent to make the various decisions needed to institute legal action. By contrast, DDAC seeks access to institutionalized persons with widely varying degrees of mental and physical disabilites. In addition, the state laws at issue in *Button* cut off *all* access between lawyers and their prospective clients. Here the LSS rules appear to provide for a substantial degree of communication between LSS residents and lawyers of various types, including DDAC.

But we do not think that the merits and demerits of DDAC's novel claim should be summarily resolved within the framework of a motion to dismiss. A more extensive factual record is required, including evidence of the actual rules now in force at LSS regarding visitations, the practicalities of institutional life, the balance of harms involved, and any other matters which bear upon DDAC's first amendment claim, before judgment can be passed upon the substance and application of the asserted right. *See* 5 Wright & Miller, *Federal Practice & Procedure: Civil* § 1234 at 186 (where constitutional question at issue, court "should give the complaint special consideration and should not dismiss unless it is clear that no claim can be stated"); *id.* § 1357 at 602 (complaint should not be dismissed under Rule 12(b)(6) "merely because the court doubts plaintiff will prevail in the action"). The judgment of the district court dismissing DDAC's first amendment claim for lack of "standing," therefore, must be vacated and the case remanded for further proceedings in conformity with this opinion.

*So ordered.*