**Patricia M. SUMME, Circuit Judge, Sixteenth Judicial Circuit, Fourth Division, Appellant,**

v.

**JUDICIAL RETIREMENT AND REMOVAL COMMISSION, Appellee.**

No. 96–SC–000034–RR.

Supreme Court of Kentucky.

June 19, 1997.

James T. Gilbert, Richmond, Chandra S. Baldwin, Jeffrey C. Mando, Philip Taliaferro, III, Christopher J. Mehling, Covington, for Appellant.

James D. Lawson, Executive Secretary, Judicial Retirement and Removal Commission, George F. Rabe, Lexington, for Appellee.

*OPINION*

STEPHENS, Chief Justice.

This appeal from a decision of the Judicial Retirement and Removal Commission [hereinafter "Commission"] involves two counts brought against Circuit Judge Patricia M. Summe, 16th Judicial District, Fourth Division, Kenton County, Kentucky, stemming from her campaign for circuit judge in the general election held November 8, 1994. Count I charges that appellant depicted the *Kenton County Citizen's Courier* as an independent publication of regular or periodic issue for citizens of Kenton County, Kentucky, when it was in fact campaign material, prepared and distributed by appellant, or on her behalf, solely for the specific purpose of supporting her campaign. Count II regards a letter written by Mary Gregory in support of appellant's 1994 campaign which was distributed or allowed to be distributed to members of the medical profession in Kenton County, Kentucky by appellant.

After a hearing on the matter, the Commission found appellant to be in violation of the Code of Judicial Conduct on both charges. Specifically, the Commission unanimously determined that the format of the *Kenton County Citizen's Courier* was designed to give the impression to voters that an independent organization advocating child abuse issues supported appellant in her race for circuit judge and, thus, was a misrepresentation of fact in violation of Canon 7B(1)(c) of the Code of Judicial Conduct, SCR 4.300. The Commission also determined that the statements in the letter from Ms. Gregory to nurses in Kenton County constituted a pre-election commitment on the issue of probation in child abuse cases in violation of Canon 7B(1)(c). The Commission further concluded that use of both of these documents in the campaign was in violation of SCR 4.300, Canons 1 and 2A, in that appellant failed to observe high standards of conduct in her campaign and failed to conduct herself in a manner that promoted pub-

lic confidence in the integrity and impartiality of the judiciary.

Finally, the Commission noted that both documents were released within one to two weeks of the election which effectively prevented appellant's opponent from making any response to the advertisements or from getting any relief by filing a complaint with the Commission. The Commission asserted that while it was impossible to determine the exact effect these documents had on the outcome of the election, it believed the advertisements surely contributed to appellant's victory. The Commission believed that such campaign tactics were "unacceptable and blatantly unfair to those candidates who attempt to comply with both the letter and spirit of the Canons of Judicial Ethics." As a result, the Commission ordered appellant to be suspended for a total of sixty (60) days, thirty (30) days on each count to run consecutively.

In her appeal to this Court, appellant acknowledges responsibility for use of the two documents in her campaign, but contends that the Commission's determination is clearly erroneous for two reasons: (1) it is arbitrary and capricious as not being based on clear and convincing evidence, and (2) it is unconstitutional. Consequently, she now requests this Court to vacate and set aside the Commission's order and to dismiss all charges against her.

### Count I—Newspaper Format

■ As previously stated, appellant was a candidate in the general election held on November 8, 1994. She was subsequently elected to the position of Kenton County Circuit Judge by a margin of 15,302 votes to 13,861 votes. Nearly one week prior to the election, between 5000 and 6000 copies of the *Kenton County Citizen's Courier* were distributed to potential voters in Kenton County. The following appears on the front page of the distributed material:

a. The name "Kenton County Citizen's Courier" with the caption "Today's News For Concerned Citizens of Kenton County" directly below the name.

b. The designations "Four Pages" and "Oct/Nov 1994".

c. An article with the lead-in "Through the eyes of a child ..." which contained a photograph of a young battered child.

d. A bolded "Editor's Note" at the bottom of the article which reads:

Editor's Note: The child's grandmother and legal guardian gave permission to use the photo in this article, explaining that due to excessive bruising and swelling, the child cannot be identified.

e. Another article captioned "Study shows child abuse affects go beyond childhood."

The following appears on the back page of the document:

a. A column headed "Viewpoint ... To the editor of the *Citizen's Courier*."

b. A letter purporting to be to the editor, supporting appellant and containing the statement: "I will vote for Patricia M. Summe for Circuit Court Judge because I know Pat Summe is concerned about crime."

c. A letter to voters from Judge Summe which is inset on the top right half of the back page.

d. A return address of "3384 Madison Pike, Ft. Wright, KY 41017" without any identifying name or organization above it.

Appellant maintains that the distributed material was appropriately identified as being campaign literature. She contends that the *Kenton County Citizen's Courier* was folded for delivery so that her letter and logo on the back page were clearly visible and would surely inform the voters that this was a campaign advertisement. She further asserts that the newspaper type mailer displayed her campaign logo, a "paid-for" acknowledgement, and contained a return address. Appellant also claims that the wording of her letter which was contained within the mailer clearly identified the whole mailer as being campaign material.

We agree with the Commission's conclusion that nearly all of the *Kenton County Citizen's Courier*'s features, both individual-

ly and collectively, portray the publication as something other than campaign literature. Basically, this was a newspaper-type publication which resembled a tabloid. While appellant's letter to voters within the mailer does indicate her campaign as its source, the way in which the letter is inset does not make it appear that the *entire* mailer is a "paid-for" campaign advertisement. More importantly, as the Commission noted, there is absolutely *nothing* on the front page of this supposed campaign literature which identifies its source or indicates who is paying for it.

Likewise, other than appellant's letter, there is not one indication on the back page of the document that it is campaign literature. Instead, on both the front and back of the publication, words and phrases like "Editor's Note", "Viewpoint" and "To the editor of the *Citizens Courier*" are used. Even the name of appellant's campaign was left off the return address on the back page. Such a format could have only been used for one purpose—to mislead voters into believing that the *Kenton County Citizens Courier* was something other than campaign literature. In fact, appellant's own brother, Peter Summe, even testified that he suggested the format of the ad because most people do not like to read campaign material.

Clearly, a voter who received this information in the mail, took it out of the mailbox with the address facing toward them, and then proceeded to open it and read it, would have no idea that this was campaign material. The only voters that would possibly come to this revelation would be those who subsequently turned over the document and noticed the inset campaign logo and "paid-for" acknowledgment. Even then, however, it is speculative whether a voter would realize that the inset campaign letter was not just a campaign advertisement in a publication, and actually applied to the entire mailer.

Additionally, appellant argues that the format of the *Kenton County Citizen's Courier* was not misrepresentative as it was one commonly used in elections in Kenton County and her attorneys and campaign advisers had advised her that it was legal and appropriate. Multiple documents do exist in the record which indicate this format was used by many candidates who have run for office in the Northern Kentucky area. However, a careful examination of these documents indicates that unlike the present document, they are clearly marked as campaign material. For example, all of these documents contain some type of indication on the *front* of the mailer identifying them as campaign material. Additionally, an identifying name or source is provided above virtually all of the return addresses in these documents.

It is also important to note that many of the additional documents in the record do not relate to judicial campaigns and, thus, are not governed by the Code of Judicial Conduct. In fact, if appellant had not "distilled down" the format she adopted from others who have run for office in the Kenton County area, we probably would not be here today as the mailer would have unquestionably resembled campaign material.

Moreover, appellant maintains that it would not constitute a misrepresentation of facts under our decision in *Doyle v. Judicial Ret. and Removal Comm'n*, Ky., 885 S.W.2d 917 (1994), because a reasonable person would know that the mailer was campaign literature. Contrary to appellant's assertion, *Doyle, supra*, is distinguishable from the present case. One of the issues this Court determined in *Doyle* was that an altered newspaper photograph used in a campaign advertisement did not amount to clear and convincing evidence of a "deliberate misrepresentation of fact." *Id.* at 918. Clearly, what failed to constitute a misrepresentation in *Doyle* is different from what is alleged as a misrepresentation in the present case.

■ Finally, we assert that the responsibility for the accuracy and fairness of the campaign advertisement ultimately lies with appellant. Neither appellant nor members of her campaign attempted to have the *Kenton County Citizen's Courier* reviewed by the Judicial Ethics Committee, although such service was available. While appellant did testify before the Commission that she did not present a request to the Judicial Ethics Committee because it took seven weeks for her to receive a response to a previous inquiry, the fact that she did not have enough time before the election to seek the Commit-

tee's opinion, should not provide her with a way to totally avoid the Code of Judicial Conduct. Thus, using the "clear and convincing" standard we set forth in *Wilson v. Judicial Ret. and Removal Comm'n*, Ky., 673 S.W.2d 426 (1984), we affirm the decision of the Commission as to Count I against appellant.

### Count II—Mary Gregory Letter

■ Appellant's cousin and supporter, Mary Gregory, prepared a letter in support of appellant which was mailed to 800 nurses in Kenton County. The letter detailed the specifics of a child abuse case which had been before appellant's opponent, the current circuit judge. The letter reads in full as follows:

October 24, 1994

[picture inset, of a battered child]

Dear Medical Professional,

This child was born on August 25, 1989 into a world where she thought she would be loved and protected. Instead on November 26, 1992 she was brought to St. Luke West seriously battered. This small innocent child had multiple abrasions and contusions including bilateral raccoon eyes and a perforated eardrum.

Her abuser is the mother's 41 year old boyfriend. He was found guilty and sentenced to only five years by Judge Trusty though the prosecutor argued for ten years. Judge Trusty then probated this criminal's sentence, and he actually only served 153 days.

In 153 days her physical injuries were healed but the emotional scar will last a lifetime.

As medical professionals who witness abuse daily, it is time to judge our judges. How many times have you filled out abuse forms? How many times have you seen repeat abuse by repeated abusers? It is time to stop the abuse instead of treating it.

Please join me in stopping the abuse and vote for a person who will let no one walk away before justice is served. She has concern for the victim.

Vote for Patricia M. Summe, November 8, 1994 for Circuit Court Judge.

Sincerely,

Mary S. Gregory, R.N., E.R.

St. Elizabeth North

[Caption stating that postage and stationary were paid for by appellant's campaign committee]

Appellant argues that the Commission's decision incorrectly holds that criticism alone of an incumbent judge amounts to a pre-election announcement and commitment to the voters regarding appellant's position on the issue of probation in child abuse cases. She further contends that the Commission's decision attempts to reverse this Court's holding in *J.C.J.D. v. R.J.C.R.*, Ky., 803 S.W.2d 953 (1991). We disagree.

Our holding in *J.C.J.D.*, *supra*, does not even apply to the case *sub judice* as it is based on the former version of Canon 7B(1)(c) which has now been replaced by the version presently at issue. In addition, the letter at issue in the present case clearly goes beyond criticism of appellant's opponent, which was the primary issue in *J.C.J.D.*, as it contains a graphic picture of an abused child and states that her opponent sentenced the child's abuser to five years even though the prosecutor had requested ten. The letter goes on to state that her opponent probated that particular sentence after the abuser served only 153 days and that "it is time to judge our judges" and "to stop repeated abuse instead of treating it." The letter concludes by encouraging voters to "join me in stopping the abuse and vote for a person who will let no one walk away before justice is served," which is followed by a "paid-for" acknowledgment.

The obvious crux of the letter is that appellant's opponent lets child abusers off easy and that if appellant was elected, she would not. As was aptly stated in a treatise on the various rules of judicial conduct throughout the United States:

Ethics advisory opinions have addressed the propriety of numerous statements and pledges candidates have proposed to use in the course of a campaign. The general sense of these opinions is that anything

that could be interpreted as a pledge that the candidate will take a particular approach in deciding cases or a particular class of cases is prohibited.

Jeffrey M. Shaman et al., *Judicial Conduct and Ethics,* Section 11.09, p. 372 (Michie 2nd ed., 1995). While in isolation, a judge who "will let no one walk away before justice is served" is something to which all should aspire, in the context of the present judicial campaign, it represented appellant's commitment to prevent the probation of child abusers. The evidence fully supports this conclusion and, therefore, we affirm the decision of the Commission as to Count II.

### Constitutional Arguments

■ Appellant raises additional arguments concerning the constitutionality of both the Commission's decision and Canon 7B(1)(c). First, appellant argues that the Commission's prohibition against the use of a newsletter format and the use of the Mary Gregory letter is unconstitutional in that it infringes on appellant's constitutional right to freedom of speech under the First Amendment of the United States Constitution and Section 8 of the Kentucky Constitution. Second, appellant contends that the language in Canon 7B(1)(c) is unconstitutionally overbroad and vague. In support of her arguments, appellant again cites to *J.C.J.D., supra,* and also to *Buckley v. Judicial Inquiry Board,* 997 F.2d 224 (7th Cir.1993).

As previously mentioned, *J.C.J.D., supra,* is not controlling in the present case as it was based on the former version of Canon 7B(1)(c). Furthermore, *Buckley, supra,* is not persuasive as that opinion addressed an Illinois rule similar to our former Canon 7B(1)(c). However, our present Canon 7B(1)(c) was challenged under the First, Fifth and Fourteenth Amendments to the United States Constitution as overbroad or vague in *Ackerson v. Kentucky Judicial Ret. and Removal Comm'n,* 776 F.Supp. 309 (W.D.Ky.1991). In *Ackerson* the federal district court upheld the Canon with respect to its prohibition against campaign statements committing or appearing to commit a candidate with respect to legal issues which were

likely to come before it. *Id.* at 315. Specifically, the court stated:

> This interest [the necessity of maintaining the impartiality of the legal process] is simply too great to allow judicial campaigns to degenerate into a contest of which candidate can make more commitments to the electorate on legal issues likely to come before him or her.

> We therefore find that the canon is sufficiently and closely drawn so as to avoid unnecessary abridgment of a judicial candidate's right of free speech during the campaign. We also find the canon is neither vague nor overbroad in this regard.

*Id.*

Later, in this Court's decision in *Deters v. Judicial Ret. and Removal Comm'n,* Ky., 873 S.W.2d 200 (1994), we also reviewed the constitutionality of our present Canon 7B(1)(c) and rejected the challenge as follows:

> The language of our present canon 7B(1)(c) has, however, been specifically upheld by a Federal Court as having been "sufficiently and closely drawn so as to avoid unnecessary abridgment of a judicial candidate's rights of free speech during the campaign." *Ackerson v. Kentucky Judicial Retirement and Removal Commission,* 776 F.Supp. 309 (W.D.Ky.1991). The opinion recognized that, while candidates for elective judicial office are not without the protection of the First Amendment, their campaign conduct has nevertheless been regulated to a greater degree than non-judicial candidates.

*Id.* at 204. We further noted that the present Canon was promulgated after *J.C.J.D., supra,* and specifically emphasized that the present Canon was more narrowly tailored than its predecessor. *Id.* at 204. Moreover, in adopting the federal court's decision in *Ackerson* we stated:

> There is a compelling state interest in so limiting a judicial candidate's speech, because the making of campaign commitments on issues likely to come before the court tends to undermine the fundamental fairness and impartiality of the legal system.

*Deters*, 873 S.W.2d at 205. Thus, we uphold the constitutionality of the Commission's decision and Canon 7B(1)(c).

### Commission's Lack of Jurisdiction

■ Appellant further argues that review of the *Kenton County Citizen's Courier* by at least eight different lawyers involved in appellant's campaign and review of the Mary Gregory letter by her attorney established that appellant necessarily acted in good faith with respect to both documents. Consequently, she contends that the charges are beyond the jurisdiction of the Commission under SCR 4.020(2).

SCR 4.020(2) provides: "Any erroneous decision made in good faith shall not be subject to the jurisdiction of the Commission." It is obvious that "erroneous decision" is a term of art which refers to *judicial* decisions made by judges in the course of their official duties. We clarified this in *Nicholson v. Judicial Ret. and Removal Comm'n*, Ky., 562 S.W.2d 306 (1978), decided thirty (30) days after the effective date of the above rule, where we stated:

The purpose of this addition was to make explicit that which we recognized to be implicit in our constitution and the rule. In a state which has an elected judiciary incompetence which is not gross and persistent can be safely left to elimination at the ballot box. Error can be adequately corrected by the appellate courts. Any other approach to the problem would destroy judicial independence by causing judges to keep one eye on their reversal rate and the other on the Commission. Both judicial eyes should be trained on the just disposition of the case at hand and not on the welfare of the sitting judge.

*Id.* at 310.

Certainly, SCR 4.020(2) does not exclude from the jurisdiction of the Commission campaign violations committed under claims of ignorance of the law or of advice of counsel. Neither document at issue in the present case was submitted to the *Ethics Committee* for its prior approval, and no Supreme Court rule excuses noncompliance based on the advice of attorneys working in a candidate's campaign.

### Conclusion

■ In conclusion, we affirm the Commission's determination finding appellant violated both Count I and Count II. However, we find the Commission's remedy for the violation of Count I and Count II as excessive and inappropriate in light of our assertion in *Nicholson, supra,* that:

The aim of proceedings instituted pursuant to this section is to improve the quality of justice administered within the Commonwealth by examining specific complaints of judicial misconduct, determining their relation to a judge's fitness for office and correcting any deficiencies found by taking the least severe action necessary to remedy the situation. The target is not punishment of the judge.

*Id.* at 308. We later reiterated this same objective in *Doyle*, 885 S.W.2d at 919. Accordingly, the order of the Judicial Retirement and Removal Commission is affirmed as to the guilt of Patricia M. Summe on Count I and Count II and, pursuant to SCR 4.290(5), the original thirty (30) day suspension on each count to run consecutively is modified to a thirty (30) day suspension on each count to run concurrently, effective as of the date of this opinion.

LAMBERT and STUMBO, JJ., concur.

COOPER and JOHNSTONE, JJ., concur with the majority opinion except they would run the sentences consecutively as recommended by the Commission.

GRAVES, J., dissents and files a separate dissenting opinion.

WINTERSHEIMER, J., joins this dissenting opinion.

GRAVES, Justice, dissenting.

Respectfully, I must dissent.

Patricia Summe entered the rough and tumble world of Kentucky electoral politics and was successful in unseating a recently gubernatorially appointed incumbent circuit judge, Frank Trusty. She ran a good campaign against a tough opponent and was popularly elected by the Kenton County voters.

In Kentucky, both the law and tradition allow judicial candidates, like all other candidates in political elections, to be guided by the rules of the Marquis de Sade as long as they tell the truth. Idealists would restrict judicial candidates to the rules of the Marquis de Queensbury.

After investigating the allegations against Patricia Summe, and preferring charges against Patricia Summe, the Judicial Retirement and Removal Commission, ("JRRC") convicted Patricia Summe of using tactics that were "unacceptable and blatantly unfair to those candidates who attempt to comply with both the letter and spirit of the Canons of Judicial Ethics." The only thing she has done is present facts (all of which were accurate), germane to her race, in a way that encouraged voters to read them and become informed. She told the truth, operated within the rules, and should be exonerated.

## I. THE *KENTON COUNTY CITIZEN'S COURIER*

In order to gain the reader's attention and save the political campaign literature from being discarded immediately, Patricia Summe used an enticing format of a newsletter. The JRCC unanimously determined that the format of this item of campaign literature, a newsletter on slick paper entitled the *Kenton County Citizen's Courier*, was designed to give the impression to voters that an independent organization advocating child abuse issues supported Patricia Summe, and thus was a misrepresentation of fact in violation of Canon 7B(1)(c) of the Code of Judicial Conduct.

Canon 7B(1)(c) provides a candidate should not misrepresent his identity, qualifications, present position, or other facts. Identity, qualifications, and present positions are quantifiable empirical facts and deeds that can be proven either to be true or to be not true. That is, identity, qualifications, and present positions are verifiable data about objects or events experienced through one of our five senses. As the term "other facts" is used in this context we should conclude that other facts require some deed or event that can be verified by objective evidence. To say the *Kenton County Citizen's Courier* is a misrepresentation is a value judgment. What the JRRC and the majority have done is substitute a qualitative value judgment when an empirical fact is required by the context of Canon 7B(1)(c). To say the *Kenton County Citizen's Courier* is deceptive is not an empirical fact but a factual value judgment existing only in the eye of the beholder. An example is seeing something in a delusion, which is not to see something but merely to think you are seeing something. When those in authority penalize judicial candidates for things that exist only in our minds, we are dangerously close to the *Animal Farm* or a *Brave New World*.

Error is a distortion that results from a partial view of reality. Value judgments expressive of quality are abstract concepts that do not admit of error and therefore cannot be proven either to be true or to be not true. Truth is determined by a set of necessary and sufficient conditions and guidelines which must be met. For example, the term intelligent is used as an opinion or value judgment. When a baby says his first words, the parents say, "My baby is intelligent." The parents are simply stating an opinion even though the baby may have an I.Q. of 160, but when the term intelligent was used, there were no conditions met to determine objectively whether the baby was intelligent or not. If we are going to find that the *Kenton County Citizen's Courier* is deceptive and misrepresentative, we should give judicial candidates guidelines to follow and conditions that must be met. Without guidelines, to say the *Kenton County Citizen's Courier* is an independent publication is a mere opinion and not a verifiable fact. Opinions differ from one case to another. Facts do not change.

The concept of an independent publication of regular or periodic issue is the product of creative non-factual inferences. Other candidates have originated and recently used campaign literature entitled *The Citizen's Courier*. In Northern Kentucky the publication of these types of newsletters is as regular and periodic as elections in Kentucky which were at the time every six months. This is very similar to other modern mass marketing techniques. Examples are the literature

from *Reader's Digest* and Publisher's Clearinghouse advising recipients that they may have won millions of dollars.

The JRRC concluded that nowhere in the publication is there any suggestion that Patricia Summe's campaign is the source. It is obvious that the JRRC did not read the newsletter with a careful eye and did not perceive that which is there to be seen. It is wrong to say the newsletter is deceptive when evidence of its deception cannot be produced.

The JRRC argues as follows:

"However, the letter is inset at an oblique angle which extends into the . . .; it is also printed with shadow images; this presents the letterhead as an insert or inclusion in the publication rather than as identity of the publisher."

In *Wilson v. Judicial Retirement and Removal Commission,* ·Ky., 673 S.W.2d 426 (1984), this Court held that the JRRC is the finder of facts in any particular case and may make reasonable conclusions based on those facts. *Id.* at 427. To find that the *Kenton County Citizen's Courier* was an independent publication was not a reasonable conclusion because the context of Canon 7B(1)(c) requires verifiable facts.

This item of campaign literature complied with all requirements of Kentucky campaign law because it contained a disclaimer revealing that it was paid for by the Summe campaign. KRS 121.190 provides:

All . . . circulars, . . . handbills, . . .· which expressly advocate the election or defeat of a clearly identified candidate, . . . for . . . election to any public office shall be identified by the words "paid for by" followed by the name and address of the individual or committee which paid for the communication; . . .

The JRRC ignores reality when it states that nearly all of the newsletter's features, both individually and collectively, portray the publication as something other than campaign literature. The newsletter was nothing other than campaign propaganda. Such is obvious to anyone who examined the newsletter. The majority comments that the letter within the newsletter does not make it

clear that the entire piece of campaign literature was paid for by the Summe campaign. There is nothing in KRS 121.190 that requires that the "paid for by" disclaimer be at any particular part of campaign literature. The statute merely requires a disclaimer for those inquiring minds that want to know more. The *Kenton County Citizen's Courier* reveals how an inquisitive voter could contact the Summe campaign because her law office of 3384 Madison Pike, Ft. Wright, Kentucky, was listed as the return address for the publication. The JRRC noted that there is not one indication on the front page of the document that it is a campaign advertisement distributed by Patricia Summe. Again, KRS 121.190 does not require the "paid for by" disclaimer on campaign literature to be designated on the first page, the last page, or any particular page. The statute merely requires that campaign literature contain the "paid for by" disclaimer. The *Kenton County Citizen's Courier* contained the "paid for by" disclaimer.

Even though the newsletter was conventional for elections in Kenton County, the placement of the disclaimer was unconventional in that the disclaimer was part of a previously widely circulated campaign letter that was an inset in the newsletter. That is, when the letter was circulated, the "paid for by" disclaimer was clearly identified at the base of that sheet of paper. When the newsletter ·was prepared, the letter carrying the same "paid for by" disclaimer, became an integral inseparable part of the newsletter. Because KRS 121.190 does not specify that a disclaimer be placed at any particular place on campaign literature, Patricia Summe complied with the laws existing at that time by having the disclaimer on a letter that was part of the newsletter. Perhaps the majority and the JRRC think the newsletter should have had an additional disclaimer; however, the law requires only one disclaimer.

The newsletter was marketed and distributed in such a manner that Summe's logo was distinctive and widely circulated on the back page where it was clearly visible. Every fact stated in the newsletter is true. Nothing that is stated is inaccurate. The JRRC and majority find a violation of ethics

merely because of the location of the "paid for by" disclaimer in the newsletter. Had Patricia Summe placed her disclaimer conventionally at the end of one of the pages or at the top or the bottom of one of the pages of the newsletter, as the JRRC suggests, or perhaps lost the election, this issue would not be before us. This case is here because the JRRC drew the invalid deductive inference that the format was designed to give the impression that an independent organization (or some organization other than the Summe campaign) advocating child abuse issues supported Patricia Summe. A reading of the entire document reveals that there is not an independent organization because none exists and that no one other than the Summe campaign could have distributed the literature urging the election of Patricia Summe.

The format, layout, and content of the newsletter had only one purpose: for people to vote for Patricia Summe rather than Frank Trusty. There is nothing in the *Kenton County Citizen's Courier* to indicate any attribution to an entity whatsoever other than the Patricia Summe campaign. In fact, the newsletter contained information that aided and assisted an interested voter in making an informed decision and inquiring further about the candidates. For this Patricia Summe should be commended.

At the time of the distribution of the newsletter, the market had been saturated by the Summe logo. Those interested in the judicial election could recognize the logo and attribute the newsletter to the Summe campaign. There is nothing in the law that alerts, gives notice, prohibits, or cautions against having the "paid for by" disclaimer as part of a letterhead with a logo at an oblique angle as part of other campaign literature. Anyone who read the whole instrument would arrive at the only logically valid deduction that it was from the Summe campaign. Patricia Summe did not misrepresent any facts. She tactfully avoided any misrepresentation. She did everything the law requires. She merely did not present the facts in the form that the JRRC thinks she should. More importantly, she operated within the law which we had defined. To penalize Patricia Summe now is analogous to an *ex post facto* law.

Patricia Summe complied with the applicable laws as they were written and pronounced at the time of her campaign. At the time the Summe campaign prepared and distributed the *Kenton County Citizen's Courier*, the baseline pronouncement from the Court concerning campaign literature was *Doyle v. Judicial Retirement and Removal Commission*, Ky., 885 S.W.2d 917 (1994).

In *Doyle* this Court held that a political advertisement using a blatantly "doctored" photograph did not reach the level of "deliberate misrepresentation of fact." This Court stated there was no attempt by Judge Doyle to pass the photo off as a statement of facts; therefore, the Commission's finding that the photo was a "deliberate misrepresentation of fact" was not based on clear and convincing evidence. It is a contradiction in terms that Judge Doyle's political advertisement was acceptable to this Court while Patricia Summe's is not. Patricia Summe's use of a true story presented to the general public in a newsletter format in no way rises to the level of Judge Doyle altering a photograph of her opponent and then insinuating that he adhered to a certain stance on a specific political issue. If this Court felt that Judge Doyle's use of an altered picture did not reach the level of a "deliberate misrepresentation of fact", then how could Patricia Summe's use of a newsletter format be considered a misrepresentation of fact?

After reading this Court's opinion in *Doyle*, Patricia Summe and her advisors certainly acted reasonably, logically, and in good faith in concluding that *Kenton County Citizen's Courier* was permissible campaign literature. They had no way of predicting that the JRRC would interpret the law differently from prior decisions of this Court. The conduct in *Doyle* was much more egregious than the conduct of Patricia Summe. Yet, we did not penalize Doyle, who lost the election. It is inconsistent and questionable to penalize less culpable conduct by one who won the election. Does the margin of victory or defeat determine the difference? There is no evidence that Patricia Summe's victory was in any way related to the newsletter and it is

**52**

discriminatory to punish her just because she won.

I also disagree with the majority's conclusion that JRRC's decision and Canon 7B(1)(c). satisfy constitutional requirements. Today's decision imposes a chilling effect upon the First Amendment rights of judicial candidates and the public's need to be informed. This is especially true when it is public knowledge that what Patricia Summe printed was true and the statutorily required disclaimer, acknowledging that Patricia Summe's campaign paid for the advertisements, was properly on the document. As Justice Wintersheimer pointed out in his dissent in *Deters v. Judicial Ret. and Removal Comm'n*, Ky., 873 S.W.2d 200 at 205–206:

> Political free speech is primary as the cornerstone of a responsible representative democracy because it relates directly to the function of government in a free society. An informed electorate is the foundation of true liberty. The judiciary is no exception and is subject only to limitations which must be carefully and narrowly drawn.

.    .    .    .    .

> There is a fundamental right of people to know any candidate's views and to obtain the information that is relevant to them in making their electoral choices. A restriction on a candidate's right to engage in legitimate political discussion restricts the electoral process by not allowing the voters to obtain the necessary information....

> The need and right of the voter to have information should be unchallenged and should be paramount in this consideration....

The United States Constitution guarantees the fundamental right of free speech. Congress can make no law and the government cannot enforce any law which abridges this guaranteed freedom. Similarly, Section 8 of the Kentucky Constitution provides that "every person may freely and fully speak, write and print on any subject, being responsible for the abuse of that liberty."

## II. THE MARY GREGORY LETTER

Criticizing an opponent's handling of a case does not constitute a pre-election commitment to a certain position. Patricia Summe did not violate the rules of judicial ethics by using the Mary Gregory letter in her campaign. There must be "clear and convincing" evidence to support charges brought by the JRRC. *Wilson, supra;* SCR 4.160. Under *Wilson*, the Supreme Court must accept the findings of the JRRC unless they are clearly erroneous. In the instant case, the Commission's decision must be based on evidence which clearly supports a finding that Patricia Summe made a pre-election commitment to the voters that she would not probate child abusers. There is no such clear evidence.

By her own testimony, Patricia Summe stated that she was not committing herself to a particular position on the issue of probating child abusers. In fact, Summe asserted that she was merely criticizing the way her opponent handled one particular case. The testimony of Mary Gregory further indicates that Patricia Summe was only attempting to get across the point that justice would be better served if Summe were to be elected.

In *Ackerson v. Kentucky Judicial Ret. and Removal Comm'n.*, 776 F.Supp. 309 (W.D.Ky.1991), a federal court held that under current Kentucky law, judicial candidates may discuss and debate any legal issues which may come before the court on which they are seeking a position, but they may not commit themselves to any particular position on those issues, restating SCR 4.300, Canon 7B(1)(c). Accepting Summe's statement that she was criticizing her opponent does not justify the conclusion that comments made in the letter constituted a commitment to the voters. Instead it is a discussion or debate about Judge Trusty's decision in a particular case. As such, her statements are placed in line with the holding in *Ackerson.*

While Patricia Summe stated that she did not agree with Judge Trusty's handling of the case and would have acted differently in that particular case, she did not state that she would always act in a certain way. Thus, the evidence introduced at trial does not clearly and convincingly prove that Patricia

Summe committed herself to a particular position. In fact, the only contradictory testimony given was mere speculation and strained inference. As such, the findings of the JRRC were unreasonable and clearly erroneous as to the alleged violation of SCR 4.300.

Patricia Summe also testified that she read the letter in question "against the rule" to check for possible violations. She believed that she herself could make the statements contained in the letter and that it would therefore be satisfactory for Mary Gregory to make the same statements. This letter went through the same strict scrutiny and careful evaluation to which all other campaign materials were put before they were allowed to be distributed. Various other testimony showed that there was great concern in the campaign to stay within the rules for judicial conduct.

This letter was written by Mary Gregory entirely on her own initiative after seeing photographs of the abused child and hearing how the case was disposed of. Patricia Summe did not encourage the writing of the letter, nor did she tell Mary Gregory what to say in the letter. The only reason that this letter became part of the campaign was Summe's concern with the financial campaign laws dealing with donations in kind. In order to steer away from such problems (and any appearances thereof), Summe stamped her name on the letter and paid for the stationary and postage. Since the letter was not written by Patricia Summe, as noted above, it is unreasonable to charge her with a supposed commitment to preclude probation for convicted child abusers. The "paid for by" disclosure may be seen as attributing the statements to Patricia Summe. Nevertheless, if the statements are attributed to Patricia Summe, they still do not amount to a commitment to any position on the disposition of child abuse cases.

The majority sets forth the opinion that the "obvious crux" of the wording in the letter is that Patricia Summe is committed to the prevention of probating child abusers. The majority goes on to quote Shaman's *Judicial Conduct and Ethics*, saying that any statements which "could be interpreted

as a pledge" to take a particular approach to certain cases is prohibited. Section 11.09, p. 372 (Michie 2nd ed., 1995). This quote is very powerful, except for the fact that Summe never made any pledges to the voters. Again, we are confronted with the situation of whose words are on the page. If Patricia Summe wrote the letter, a closer look would be necessitated, but since these are the words of Mary Gregory they cannot reasonably be attributed to Summe as making a pre-election commitment to this issue.

It may be argued that a layman would read the Mary Gregory letter as saying that Summe would prevent the probation of child abusers. However, as stated before, a strict reading of the letter shows that the only claim made therein is that justice would be served. This recapitulates the mandate in Canon 7B(1)(c) to promise only to faithfully and impartially perform the duties of the judicial office. Again, Patricia Summe followed the "letter and spirit" of the Canons as they were written and interpreted at the time of her actions.

## III. INFRINGEMENT OF FREEDOM OF SPEECH

The majority has overstepped its bounds. It is placing a burden on candidates for judicial office to censor every word which is written about them so as to comply with an interpretation of the rules of judicial ethics which is not reasonably foreseeable. If the Court wishes to lay down this rule, it should do so in an appropriate situation and not punish those who were acting under a reasonable interpretation of the rules as written.

The JRRC has violated Patricia Summe's constitutional rights by its application of the canon to the facts here. The JRRC's prohibition against the use of a newspaper format and the use of the Mary Gregory Letter is unconstitutional in that it infringes upon Patricia Summe's constitutional right to freedom of speech under the First Amendment of the United States Constitution and Section 8 of the Kentucky Constitution.

As pointed out in *J.C.J.D. v. R.J.C.R.*, Ky., 803 S.W.2d 953 (1991), freedom of speech extends to a candidate for public office, in-

**54**

cluding judicial office. "The candidate, no less than any other person, has a First Amendment right to engage in the discussion of public issues and vigorously and tirelessly to advocate his own election. . . .", *Buckley v. Valeo,* 424 U.S. 1, 52, 96 S.Ct. 612, 651, 46 L.Ed.2d 659 (1976), and "make [his] views known so that the electorate may intelligently evaluate the candidates' personal qualities and their positions on vital public issues before choosing among them on election day." *Id.* at 53, 96 S.Ct. at 651. A person does not surrender his constitutional right to freedom of speech when he becomes a candidate for judicial office. *American Civil Liberties Union of Florida, Inc. v. The Florida Bar, et al.,* 744 F.Supp. 1094 (N.D.Fla.1990).

Political advertisement, while undoubtedly designed to elect a candidate to office, should provide a voter with information to make an intelligent decision at the ballot box. *J.C.J.D. v. R.J.C.R., supra.* The United States Supreme Court has considered the public's ability to review paid advertisements and utilize the information contained therein in its proper perspective. The disclosure of truthful, relevant information is more likely to make a positive contribution to decision-making than is concealment of such information. *Peel v. Attorney Registration and Disciplinary Com'n,* 496 U.S. 91, 110 S.Ct. 2281, 110 L.Ed.2d 83 (1990). While *Peel* was rendered in the context of commercial free speech and not judicial elections, the principle that disclosure of information allows the general public to make informed decisions is equally applicable here.

In *J.C.J.D. v. R.J.C.R., supra,* this Court indicated that a broad rule prohibiting judicial candidates from speaking on disputed issues served only to turn the judicial election into a popularity contest. *Id.* at 956. Freedom of speech extends to all candidates for public office, including judicial candidates and where state regulations extend so far as to completely outlaw speech because of subject matter, there is a strong presumption of unconstitutionality.

While states have the authority to regulate the conduct of judicial elections, a person does not surrender her constitutional right to freedom of speech when she becomes a can-

didate for judicial office. *Id.* at 955. (Citing *American Civil Liberties Union of Florida, Inc., supra.*) The cardinal principle in balancing the tension between free speech and judicial propriety must remain that state laws which restrict free speech and can result in disciplinary action against the speaker are subject to very strict scrutiny. *In re Primus,* 436 U.S. 412, 98 S.Ct. 1893, 56 L.Ed.2d 417 (1978).

Under the strict scrutiny standard applicable to this analysis, the charges brought by the Commission against Patricia Summe for her use of a newspaper format in the *Kenton County Citizen's Courier* and the Mary Gregory letter offends, as a matter of law, her rights to freedom of speech. Enforcement of the charges chill a judicial candidate's ability to inform the electorate of her views and the views of her opponent. *J.C.J.D. v. R.J.C.R., supra.* As established in *J.C.J.D. v. R.J.C.R.,* Patricia Summe, as a political candidate for a judicial office, can announce her views on legal and political issues without jeopardizing the integrity and independence of the legal system or undermining the impartiality of the judiciary, and do it in a way that is interesting and raises the probability that the recipient will actually read it.

Significantly, all of the facts contained in the newsletter and the Mary Gregory letter were true and accurate. Both pieces had a disclaimer clearly indicating that the documents were paid for by the Committee to Elect Patricia Summe. Further, in the newsletter, Patricia Summe's letter to the voters made it clear that she was the author of the piece and she took full responsibility for it. Patricia Summe never intentionally tried to mislead the voters, nor was there any evidence that even one (1) Kenton County voter was misled.

Nonetheless, Patricia Summe is being punished for political speech which is not even prohibited by the Judicial Canons or the law of Kentucky. On the contrary, in *J.C.J.D. v. R.J.C.R., supra,* this Court held that to criticize a judge's decision, does not, in and of itself, undermine the public's confidence and respect for the judiciary. *Id.,* at 955. Political advertisements which criticize other candidates do not equate to committing a judi-

cial candidate to making a pledge to rule in a particular way.

The public has a right to expect that the supervision of judicial elections, although necessary, will not erode the equally necessary principle that the First Amendment extends strong protection to judicial elections. Patricia Summe's right to freedom of speech has been abridged and both counts against her should be reversed.

## IV. CONCLUSION

If Patricia Summe had won the election as a direct result of doing something wrong, she should forfeit the office. But that is not the case.

The Commission concluded that the Summe literature affected the election because she won by a narrow margin. The total mix of information available to the voters was sufficiently accurate and complete so that discipline is not warranted. If the voters, who are also intelligent, had the same adverse reaction to the *Kenton County Citizen's Courier* as the JRRC, the literature would have cost her votes, and maybe it did. There is no evidence that her victory was in any way related to these political advertisements. The small percentage of people who vote in judicial elections are sophisticated and able to determine the truth.

Because she was unconventional and let the disclaimer for the entire publication be the same disclaimer that was a part of the letter previously distributed, the JRRC and the majority of this Court have found her election conduct to be improper and thus place a mark on an otherwise unblemished record of public service in the legal and judicial systems. In future years, it is hoped that this minor blemish will not mar an impressive record of judicial service. At worst, this episode should be considered an isolated single lapse of judgment or electoral misjudgment resulting from the rules being changed in the middle of the game.

WINTERSHEIMER, J., joins in this dissent.